UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEROME SCHENTAG, individually and derivatively
on behalf of THERABRAKE, INC.

        Plaintiffs,

    -against-

GEORG NEBGEN, PARVIZ GHAHRAMANI,
VOLANT HOLDINGS GMBH, VOLANT PHARMA AG and
JOSEPH M. FAYAD,

        Defendants.

---

**COMPLAINT**

JURY TRIAL DEMANDED

_ Civ _

Plaintiffs allege for their Complaint as follows:

1. This action is brought under Section 10(b)(5) of the Securities and Exchange Act of 1934, Sections 5(a) and (b)(2) and 12(a) and (b) and 15(a) of the Securities Act of 1933 (together the "Securities Acts"), and the common law, based upon the fraud orchestrated by defendant Georg Nebgen ("Nebgen") through the use and issuance of stock of defendants Volant Holdings GmbH ("Holdings") and Volant Pharma AG ("Pharma"), and aided and abetted by defendants Parviz Ghahramani ("Parviz") and Joseph M. Fayad ("Fayad"), so as to convert and misappropriate the patents, trademarks and intellectual property of plaintiffs Dr. Jerome Schentag ("Schentag") and TheraBrake, Inc. ("TheraBrake").

I. THE PARTIES

2. Plaintiff Schentag is a citizen of the State of New York, who resides at 100 Crosby Blvd., Eggertsville, New York 14226-3246. Dr. Schentag is a 33.33% shareholder of TheraBrake.

According to cap tables for Holdings and Pharma prepared by Nebgen, Schentag is also a 31% shareholder of Holdings and a 28% shareholder of Pharma.

3. Dr. Schentag is a Professor of Pharmaceutical Sciences and Pharmacy at the University at Buffalo School of Pharmacy. He is an inventor on numerous pharmaceutical patents issued by the United States Patent and Trademark Office, is on the editorial board of a number of publications and has published extensively.

4. TheraBrake is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 100 Crosby Blvd., Eggertsville, New York, 14226-3246.

5. TheraBrake was formed on April 8, 2011 for the purpose of continued research, development and commercialization of patents and intellectual property developed by Schentag and Fayad.

6. From April 8, 2011 until November 1, 2014, the two shareholders of TheraBrake were Schentag and Fayad, each owning 50%.

7. Defendant Nebgen, upon information and belief, is a citizen of Switzerland who currently resides in Feusisberg, Canton Schwyz, Switzerland. Upon further information and belief, Nebgen is not and never has been licensed in the United States to sell securities.

8. Nebgen is a 33% shareholder of TheraBrake and, according to the cap tables for Holdings and Pharma prepared by him, Nebgen is a 31% shareholder of Holdings and a 20% shareholder of Pharma.

9. Nebgen did not pay any money for his shareholder interests. Nebgen received his interests based upon his representations that he had interested investors willing to finance the commercialization of the patents, trademarks and intellectual property hereinafter alleged.

10. Nebgen named himself the Chairman of the Board and Chief Executive Officer of Holdings and Pharma.

11. Upon information and belief, during times relevant here, Nebgen resided in Greenwich, Connecticut.

12. At times relevant here, Nebgen represented himself to be the Co-Founder and Managing General Partner of NGN Capital, a venture capital firm, with its office at 369 Lexington Avenue, New York, New York.

13. Upon information and belief, Nebgen is a member of the New York Athletic Club, located at 180 Central Park South, New York, New York 10019. He uses this address as a mailing address and he holds meetings at that facility.

14. Defendant Parviz, upon information and belief, is a citizen of the United Kingdom and a resident of the State of New Jersey, who resides at 1000 Avenue at Port Imperial, Apt. 607, Weehawken, New Jersey 07086, and who also is employed and has an office for the conduct of business at One Evertrust Plaza, Suite 1102, Jersey City, New Jersey 07302.

15. According to the cap tables for Holdings and Pharma prepared by Nebgen, Parviz is an 8% shareholder of Holdings and an 8% shareholder of Pharma. Since late October 2015, he is the Chief Operating Officer of Holdings and Pharma.

16. Since late October 2015 and continuing to date, Holdings and Pharma conduct business out of Parviz's Jersey City, New Jersey office.

17. Defendant Fayad, upon information and belief, is a citizen of the State of Nevada, residing at 3583 Tobias Lane, Las Vegas, Nevada.

18. Since November 1, 2014, Fayad, Schentag and Nebgen have each been 33% shareholders of TheraBrake. According to the cap tables for Holdings and Pharma prepared by Nebgen, Fayad is a 31% shareholder of Holdings and a 28% shareholder of Pharma.

19. Schentag paid $7500 on October 21, 2015 toward the costs of Fayad's shareholder interests in Pharma.

20. Holdings is a Swiss limited liability company, organized by Nebgen on September 16, 2015, with its principal place of business located in Feusisberg, Canton Schwyz, Switzerland.

21. Holdings was formed pursuant to and as part of the agreement by Schentag, Nebgen and Fayad to commercialize patents, trademarks and intellectual property regarding the treatment of diabetes and as an aid for dieting, based upon the fraudulent representations by Nebgen hereinafter alleged. These patents, trademarks and intellectual property were then being held by TheraBrake. Based upon Nebgen's misrepresentations, and as part of the agreement, these patents, trademarks and intellectual property were transferred and assigned by TheraBrake to Holdings pursuant to an Asset Purchase Agreement dated October 15, 2015 (the "APA"), a Patent Assignment dated October 15, 2015, and other documents executed in the United States (the "Intellectual Property"). The assignments were recorded on November 13, 2015 in the United States Patent and Trademark Office.

22. Pharma is a Swiss limited liability company, organized by Nebgen on October 30, 2015, with its principal place of business located in Feusisberg, Canton Schwyz, Switzerland.

23. Pharma was formed as part of the same agreement by Schentag, Nebgen and Fayad to commercialize the Intellectual Property transferred by TheraBrake.

24. While Holdings was formed merely to be the holder of the Intellectual Property, Pharma was formed to be the operating company that (a) licensed the Intellectual Property to third

parties, and (b) along with Holdings, was to pay for all research, development, legal fees and costs in protecting the Intellectual Property and was to obtain investor money.

25. Since late October 2015 and continuing to date, Nebgen has conducted business for Holdings and Pharma in meetings held in New York City, including the Empire Hotel, 44 West 63rd Street, New York, New York, and the NY Athletic Club at 180 Central Park South, New York, New York.

## II. JURISDICTION AND VENUE

26. This Court has original jurisdiction of this action under 28 U.S.C. §1331 and has diversity jurisdiction under 28 U.S.C. §1332.

27. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

28. Venue in this Court is proper under 28 U.S.C. §1391(b) (2), since a substantial part of the events giving rise to claims asserted herein occurred in this judicial district.

29. This Court has personal jurisdiction over defendants under N.Y. C.P.L.R. §302(a) (1), (2) and (3).

## III. THE SCHEME TO DEFRAUD

30. Between 2010 and 2012, Schentag met Nebgen numerous times at NGN Capital's New York City office to discuss his inventions of drugs and devices for the treatment and monitoring of diabetes, obesity and related diseases.

31. On January 8, 2013, Schentag met Nebgen at a JP Morgan meeting in San Francisco, California. Nebgen told Schentag that he was no longer with NGN Capital and that he was now in business for himself operating an investment company called Vivant Holdings.

32. During that meeting, Plaintiff Schentag told Nebgen about his desire to commercially exploit his and other existing patents. During that meeting, Nebgen represented to Plaintiff Schentag that he was a successful investment banker having done numerous venture capital deals. Nebgen told Schentag that he had access to investors who were willing to contribute all of the money necessary to pay to have the existing patents issued worldwide and to continue the research and development of the inventions described in the existing patents so that they could be commercially exploited.

33. Defendant Nebgen also told Schentag that in order to successfully obtain investment, the patents, trademarks and intellectual property had to be conveyed in advance to his entity. Nebgen also represented to Schentag that the acquiring entity should be formed in Switzerland since the investors would obtain substantial personal U.S. tax benefits by avoiding U.S. taxes on earned income if the founders maintained a majority interest in that company.

34. Thereafter, Schentag met in New York City with Nebgen and otherwise communicated with him by telephone and by electronic communication regarding a venture to commercially exploit his and TheraBrake's patents, trademarks and intellectual property. He repeated his representations that he had access to investors who were willing to invest.

35. In September 2014, Nebgen represented that he now had interested investors who were willing to invest and who would finance the development and marketing of the pharmaceutical products which would be developed from the Intellectual Property, and he demanded 33% of the shares of TheraBrake as his compensation. Based upon his representations, .Nebgen was granted a 33% shareholder interest in TheraBrake on November 1, 2014.

36. Throughout 2014 and 2015, Nebgen also represented that it was necessary to form a Swiss corporation for tax reasons before his investors would invest.

37. Based upon these representations, Schentag, Nebgen and Fayad agreed upon the following integrated transaction which was executed in October 2015: (a) TheraBrake transferred and assigned all of the subject patents, trademarks and intellectual property to Holdings in which the three of them became shareholders and (2) Holdings and Pharma were formed, and the three of them became shareholders in Pharma.

38. When Nebgen formed Holdings and Pharma, he made himself their sole director.

39. To pay for his shareholder interests in Holdings, Schentag wire transferred $7,602 from his New York bank account to Zuricher Kantonalbank in Zurich Switzerland. To pay for his shareholder interests in Pharma, Schentag wire transferred $14,678 on October 14, 2015 and $13,798 on December 23, 2016 from his New York bank account to Zuricher Kantonalbank in Zurich, Switzerland.

40. To pay for Fayad's shareholder interests in Pharma, Schentag wire transferred $7,500 from his New York bank account on October 21, 2015 to Bank of America, NY account of Fayad.

41. The issuance of shareholder interests to Schentag in Holdings and Pharma are the purchase and sale of securities under the Securities Acts.

42. As part of the agreed upon integrated transaction, Parviz was hired to be the Chief Operating Officer of Holdings and Pharma on October 23, 2015.

43. As part of the transaction, Holdings issued to TheraBrake a promissory note dated October 15, 2015 in the amount of $566,510.00.

44. This promissory note is the purchase and sale of a security under the Securities Acts.

45. As part of the transaction, Nebgen represented that Holdings and Pharma would pay for all research, development, legal fees and costs in protecting the Intellectual Property. To date, Holdings and Pharma have refused to pay such costs and those costs have continued to be paid by plaintiffs.

46. Since October 2015, Nebgen has continued to represent that he has investors ready to invest in Holdings and Pharma. After October 2015 and until July 2017, Nebgen participated in monthly telephone meetings with Schentag and Parviz, during which he provided false reports of progress on investor solicitations to induce plaintiffs to continue to provide research and development in furtherance of commercialization of the Intellectual Property.

47. The representations by Nebgen that (1) he had and has investors willing to invest (2) it was necessary to transfer the Intellectual Property to a Swiss company (Holdings) because of these investors and (3) Holdings and Pharma would pay for all costs of research, development, legal fees and costs, have all turned out to be false and were knowingly false when made.

48. Instead, Nebgen has orchestrated a scheme by which Schentag's and TheraBrake's intellectual property have been transferred to Holdings and Pharma, which are shell companies controlled by him. Nebgen controls Holdings and Pharma, with the assistance of Fayad and Parviz, and as a result of the fact that he named himself the sole director of each, which he did without explaining its significance to Schentag.

49. The purchase of the shareholder interests in Holdings and Pharma by Schentag, and the purchase of the promissory note by TheraBrake, were all based upon the false representations of Nebgen.

50. The false representations were made by Nebgen to induce Schentag and TheraBrake to transfer the Intellectual Property to Holdings and to induce Schentag to purchase the shareholder interests in Holdings and Pharma.

51. The sale of the securities, and the false representations, were made by the use of communications in interstate commerce and the mails.

52. Nebgen, Parviz and Fayad, as the group controlling Holdings and Pharma, have caused Holdings not to pay any of the consideration for the transfer of the Intellectual Property to it.

53. The APA recites that, as consideration for the transfer of the Intellectual Property, Holdings shall (1) pay the amount of $566,510 pursuant to a promissory note and (2) pay the Assumed Liabilities in Section 1.2 of the APA.

54. Holdings has failed to do so and Nebgen never intended for it to do so.

55. In essence, Nebgen used Holdings to defraud plaintiffs of the Intellectual Property by agreeing to pay consideration which he had no intention of paying.

56. Evidencing that Nebgen never intended to perform as agreed and that his representations were false, is that he recently informed Schentag that he never intended for Schentag to become a shareholder of Pharma upon the terms agreed to in October 2015.

57. Despite the fact that the cap table for Pharma prepared by Nebgen acknowledges Schentag as a Pharma shareholder, Nebgen recently demanded that Schentag "re-subscribe" for his Pharma shares under a different Share Purchase Agreement than the one which he had previously delivered to Schentag and which Schentag executed and returned, and upon which his payments were accepted.

58. When Schentag objected to Nebgen's "changing the deal" on Pharma, Nebgen and Fayad notified Schentag that he was no longer an officer of TheraBrake.

59. It would be futile for Schentag to demand that the Board of Directors of TheraBrake bring this action, since Nebgen and Fayad are the controlling votes on the Board.

## COUNT I – 1933 ACT

60. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-59.

61. The issuance of shareholder interests to Schentag in Holdings and Pharma are the purchase and sale of unregistered securities under the Securities Act of 1933.

62. The issuance of the securities are not exempt from registration.

63. Nebgen, Holdings and Pharma sold these securities without a prospectus, in violation of Section 5(b)(2) of the Securities Acts.

64. Nebgen, Holdings and Pharma are liable under Sections 5(a) and (b)(2) and 12(a) of the Securities Acts and (b) for selling these securities.

65. Nebgen, Parviz and Fayad acted in concert to engage in manipulative and deceptive practices in connection with the sale of securities, and have acted as "control persons," and are liable under Section 15(a) of the Securities Acts.

66. Based upon the foregoing, plaintiffs are entitled to a return of all consideration and things of value paid for the securities issued to them and rescission of all agreements executed with Nebgen, Holdings and Pharma, including but not limited to the APA and the Patent Assignment.

## COUNT II- FRAUD IN CONNECTION WITH THE SALE OF SECURITIES UNDER THE 1934 ACT

67. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-66.

68. Nebgen and Parviz induced Plaintiffs to transfer Intellectual Property to Holdings, and to fund and continue funding, by misrepresenting that:

(a) Nebgen had sophisticated investors from his prior pharmaceutical/medical device startup deals lined up to provide the financing necessary to develop and commercialize the products to be derived from the Intellectual Property and that Plaintiff should continue financing the research, and

(b) It was necessary to form a Swiss company (Holdings) already holding the Intellectual Property for the investors to invest.

69. These representations were continuously made commencing in 2013 and continuing through July 2017 to induce Plaintiffs to continue funding the research and development even though that was a contractual obligation of the Defendant companies. To this day, Plaintiffs have financed the research and development costs as well as ongoing patent costs.

70. These representations were false when made and were made with knowledge of their falsity solely to induce Plaintiffs to transfer their Intellectual Property to the Defendant companies and beyond the reach of Plaintiff and others and to pay for research and development that the individual Defendants or their shell companies had no intention or the ability to pay.

71. In addition to affirmative misrepresentations, the individual Defendants omitted material facts in connection with their sale of securities to Plaintiff which would normally be disclosed in a prospectus, including but not limited to:

11

(a) corporate governance describing who is in control;

(b) capitalization,

(c) risk factors describing what would happen if money was not raised or if there was no market for the products;

(d) the identification and experience of management; and

(e) the source and use of investment proceeds and the effect of dilution upon ownership and control.

72. Nebgen and Parviz induced Plaintiffs to transfer the Intellectual Property misrepresenting that the Defendant companies would pay for the legal fees incurred in connection with the transactions and protection of the Intellectual Property..

73. Based upon the foregoing, plaintiffs are entitled to a return of all consideration and things of value paid for the securities issued to them and rescission of all agreements executed with Nebgen, Holdings and Pharma, including but not limited to the APA and the Patent Assignment.

## COUNT 1I   COMMON LAW FRAUD.

74. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 73 as if set forth fully herein.

75. Defendants Nebgen and Parviz made the representations previously alleged.

76. The representations were false when made and were made with knowledge of their falsity.

77. Plaintiffs reasonably relied upon the aforesaid representations and were induced to transfer the Intellectual Property and expend money in reliance thereon.

78. Based upon the foregoing, plaintiffs are entitled to a return of all consideration and things of value paid for the securities issued to them and rescission of all agreements executed with Nebgen, Holdings and Pharma, including but not limited to the APA and the Patent Assignment.

### COUNT III BREACH OF CONTRACT.

79. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 78.

80. The APA provided that in exchange for the assignment of the Intellectual Property, Holdings would pay $566,510.00 pursuant to a promissory note.

81. In material breach of the Asset Purchase Agreement, Holdings has not paid the $566,510 or the interest of $37,000 thereon, despite due demand.

82. In material breach of the APA, Section 1.2, Holdings has not paid any of the liabilities or expenses it assumed.

83. Based upon the foregoing, plaintiffs are entitled to a return of all consideration and things of value paid for the securities issued to them and rescission of all agreements executed with Nebgen, Holdings and Pharma, including but not limited to the APA and the Patent Assignment.

### COUNT IV BREACH OF FIDUCIARY DUTIES

84. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-83.

85. As officers and directors of TheraBrake, Holdings and Pharma, the individual Defendants have a fiduciary duty to those entities and to the Plaintiff.

86.     Defendants Nebgen and Parviz breached their fiduciary duties by causing these Defendant companies to incur liabilities and transfer assets while they were insolvent.

87.     The individual Defendants retained patent counsel on behalf of the Defendant companies to prosecute and protect the U.S. patents, knowing and permitting patent counsel to spend time and incur the expenses of local counsel in preserving these assets worldwide, accepting those services and then refusing and failing to pay for those services in an amount in excess of $472,000, which have become liens on the assets of the Defendant Holdings.

88.     Nebgen and Parviz retained Swiss U.S. counsel to prepare documents effectuating the purchase of assets by the Defendant companies and the transfer of the patents, trademarks and intellectual property, used the transaction documents and then failed and refused to pay the law firm its legal fees in an amount in excess of $90,000.

89.     Nebgen and Parviz retained a Swiss law firm to prepare transaction documents for the transfer to an affiliated entity through licensing of the patents, trademarks and intellectual property, accepted the legal services and has failed and refused to pay that law firm's legal fees believed to be in excess of $96,000.

90.     Defendants have continuously misrepresented the financial condition and the status of the negotiations with potential investors to obtain investment funds from Plaintiffs and credit from third parties. Though the Defendant companies never received the promised and agreed upon funding, the individual Defendants continued to accrue expenses by continuing the engagement and accepting the benefit of legal services rendered. One of the law firms involved has filed a lien against the transferred patents for the outstanding legal fees in the amount of $472,539, directly leading to an immediate default of the Asset Purchase Agreement and a demand for payment in full of the promissory note to TheraBrake for $566,510. In addition, the individual Defendants

continued to misrepresent the status of negotiations with potential investors in order to induce Plaintiffs to incur additional expenses on behalf of the Defendants for continuing research and development.

**WHEREFORE,** Plaintiffs demand judgment requiring Defendants to return all consideration and things of value paid for the securities issued to plaintiffs and rescinding all agreements executed with defendants, including but not limited to the APA and the Patent Assignment, together with costs, disbursements and attorney's fees.

Dated:  November 9, 2017

ROSENBERG FELDMAN SMITH, LLP

By: *[signature]*
Richard B. Feldman
Attorneys for Plaintiffs
551 Fifth Avenue – 24th Floor
New York, New York 10176
(212) 682-3454
