UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JEROME SCHENTAG, individually and                        :
derivatively on behalf of TheraBrake, Inc.                  :
                                                                            :
                                              Plaintiff,        :              1:17-cv-8734-GHW
                                                                            :
                    -against-                                      :        MEMORANDUM OPINION
                                                                            :               AND ORDER
GEORG NEBGEN, PARVIZ GHAHRAMANI,    :
VOLANT HOLDINGS GMBH, VOLANT          :
PHARMA AG, and JOSEPH M. FAYAD,        :
                                                                            :
                                              Defendant.    :
-------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

Plaintiff Jerome Schentag, an inventor and holder of numerous medical patents, sought to

develop and commercialize his inventions.  Seduced by Defendant Georg Nebgen's promise of

investment capital that would enable Plaintiff to accomplish his goal, Plaintiff agreed to the transfer

of his intellectual property to a Swiss entity that would be formed by Nebgen.  In the resulting

integrated transaction, Nebgen formed two Swiss limited liability companies, of which Plaintiff

became a shareholder.  TheraBrake, the New York corporation holding Plaintiff's intellectual

property, transferred its rights in that property to one of the Swiss companies in exchange for a

promissory note.  After the transaction was consummated, things began to disintegrate.  Plaintiff

discovered that Nebgen's statements that investors were standing by to invest were false.  No

payment was made on the promissory note.  The Individual Defendants refused to pay for incurred

liabilities.  A lien was asserted against the assets of the Swiss holding company.  And Plaintiff was

removed as president of TheraBrake.

Plaintiff filed this action, asserting securities fraud claims under the Securities and Exchange

Act of 1934 and violations of various provisions of the Securities Act of 1933.  Plaintiff also brings

claims under state law. Defendants have moved to dismiss the complaint in its entirety. Because Plaintiff fails to plead that he acquired his shares of the Swiss LLCs, or that TheraBrake acquired the promissory note, in domestic transactions, Defendants' motion to dismiss the federal securities claims is granted. Plaintiff's breach of fiduciary duties claim survives, but the remainder of Plaintiff's state law claims are dismissed.

## I.    BACKGROUND

### A.  Factual Background[1]

Plaintiff Jerome Schentag is a professor of pharmaceutical sciences and pharmacy at the University of Buffalo School of Pharmacy. Compl. (ECF No. 2) ¶ 3. He is also an inventor and holds numerous pharmaceutical patents. *Id.* Among those inventions are pharmaceutical drugs and devices used to treat and monitor diabetes, obesity, and other related diseases. *Id.* ¶ 30. Through TheraBrake, Inc., a Delaware corporation formed on April 8, 2011, Plaintiff and Defendant Joseph M. Fayad continued their research, development, and commercialization of patents and other intellectual property held by them. *Id.* ¶ 5. From the time TheraBrake was formed until November 1, 2014, Plaintiff and Fayad each held fifty percent of the corporation's shares. *Id.* ¶ 6.

Defendant Georg Nebgen held himself out to be the co-founder and managing general partner of NGN Capital, a venture capital firm with offices in Manhattan. *Id.* ¶ 12. On several occasions during 2010, 2011, and 2012, Plaintiff discussed his inventions with Nebgen at NGN's Manhattan office. *Id.* ¶ 30.

On January 8, 2013, Plaintiff met with Nebgen in San Francisco, California. *Id.* ¶ 31. During that meeting, Nebgen informed Plaintiff that he was no longer with NGN Capital and had

---

[1] Unless otherwise noted, the facts are taken from the complaint and accepted as true for purposes of this motion. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

begun operating his own business, Vivant Holdings. *Id.* Plaintiff shared with Nebgen his desire to commercially exploit his and other patents. *Id.* ¶ 32. Nebgen told Plaintiff that he was a successful investment banker, had closed several venture capital deals, and had access to investors willing to invest the capital required to have the existing patents issued worldwide. *Id.* These investors, according to Nebgen, also had money to invest in the continued research and development of the patented inventions. *Id.* Nebgen explained to Plaintiff that before Nebgen could secure these investments, Plaintiff would need to transfer his patents and other intellectual property to an entity that Nebgen would create. *Id.* ¶ 33. Nebgen recommended that the entity be formed in Switzerland so that investors could enjoy substantial personal tax benefits. *Id.*

At some point after the San Francisco meeting, Plaintiff and Nebgen met again in New York City to further discuss the proposed venture. *Id.* ¶ 34. The two also discussed the proposal by telephone and electronic communication. *Id.* During those conversations, Nebgen continued to represent to Plaintiff that he had access to investors willing to come on board. *Id.*

The following year, in September 2014, Nebgen informed Plaintiff that he had investors interested in investing in the development and marketing of the pharmaceutical products. *Id.* ¶ 35. In return for securing the capital, Nebgen demanded 33% of the shares of TheraBrake. *Id.* On November 1, 2014, because of Nebgen's representations regarding his investors, he was granted the requested shares. *Id.* As of that date, Plaintiff, Nebgen, and Fayad each have held 33% of the TheraBrake shares. *Id.* ¶ 18.

Throughout 2014 and 2015, Nebgen continued to insist on the importance of forming a Swiss entity before his investors would contribute to their venture. *Id.* ¶ 36. Based on these statements, Plaintiff, Nebgen, and Fayad agreed upon the integrated transaction at the heart of this case. *Id.* ¶ 37. As part of that agreement, on September 16, 2015, Nebgen formed Volant Holdings GmbH ("Holdings") as a Swiss limited liability company. *Id.* ¶ 20. Holdings' principal place of

business is in Feusisberg, Canton Schwyz, Switzerland. *Id.* Holdings was formed to be the holder of the intellectual property that TheraBrake agreed to transfer to it. *Id.* ¶¶ 24, 37. Nebgen also represented that Holdings would pay for all costs associated with the research and development of the intellectual property, as well as any legal expenses incurred to protect the intellectual property. *Id.* ¶ 45.

On October 15, 2015, Plaintiff, Nebgen, and Fayad executed several written agreements to consummate the agreed-upon transaction. *Id.* ¶ 21. Among those documents were an Asset Purchase Agreement ("APA") and a Patent Assignment. *Id.* Pursuant to the APA, Holdings agreed to pay a total sum of $566,510 as well as certain other liabilities described in Section 1.2 of the APA ("Assumed Liabilities"), as consideration for the transfer of the intellectual property. *Id.* ¶ 53. Payment of the $566,510 was to be made in the form of a promissory note payable by Holdings to TheraBrake (the "Note"). *Id.* Holdings issued the Note on October 15, 2015. *Id.* ¶ 43.[2] The patent assignments were subsequently recorded in the United States Patent and Trademark Office. *Id.* ¶ 21.

Two weeks after the contracts were executed, on October 30, 2015, Nebgen organized Volant Pharma AG ("Pharma") as a Swiss limited liability company with its principal place of business in Feusisberg, Canton Schwyz, Switzerland. *Id.* ¶ 22. Pharma was intended to be the operating company and was formed to license the intellectual property acquired from TheraBrake and, along with Holdings, to pay for all research and development and legal fees and costs associated

---

[2] Defendants have filed copies of the APA and the Note with their motion papers. *See* Affidavit of Joseph Fayad (ECF No. 35) ("Fayad Aff."), Ex. 2. Plaintiff has not included in the complaint a full description of the terms of the APA or detailed facts regarding the promissory note. Nor has Plaintiff appended those documents as exhibits to the complaint. Nonetheless, both the APA and the promissory note are clearly integral to the complaint: Plaintiff has relied on both documents in framing his allegations, and Defendants' alleged failure to pay under the promissory note underlies Plaintiff's breach of contract claim. *See* Compl. ¶¶ 21, 53-55, 79-83. Therefore, the Court considers those documents in evaluating Defendants' motion to dismiss. *See DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."); *id.* ("Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." (quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006))).

with protecting the intellectual property. *Id.* ¶ 24. Pharma was also intended to be the entity pursuing investment capital. *Id.* When Nebgen formed Holdings and Pharma, he appointed himself the chairman of the board and chief executive officer of each entity. *Id.* ¶ 10. He was the sole director of each entity and failed to explain to Plaintiff the significance of this fact. *Id.* ¶¶ 38, 48.

As a result of the integrated transaction, Nebgen holds 31% of the shares of Holdings and 20% of the shares of Pharma. *Id.* ¶ 8. Plaintiff and Fayad each hold 31% of the shares of Holdings and 28% of the shares of Pharma. *Id.* ¶¶ 2, 18. To pay for his shares in Holdings, Plaintiff sent $7,602 from his New York bank account via wire transfer to an account at Zuricher Kantonalbank in Zurich, Switzerland. *Id.* ¶ 39. He also wire-transferred $14,678 on October 14, 2015 and $13,798 on December 23, 2016 to the Swiss account to pay for his shares in Pharma. *Id.* Plaintiff also paid for Fayad's shares in Pharma by sending $7,500 from his New York account to Fayad's Bank of America account in New York on October 21, 2015. *Id.* ¶¶ 19, 40.

On October 23, 2015, Defendant Parviz Ghahramani was hired as the Chief Operating Officer of Holdings and Pharma. *Id.* ¶ 42. Ghahramani holds 8% of the shares of both Holdings and Pharma. *Id.* ¶ 15. From late October 2015, Holdings and Pharma have conducted business out of Ghahramani's New Jersey office. *Id.* ¶ 16. Nebgen has also held meetings in New York City for Holdings and Pharma business since that date. *Id.* ¶ 25.

Following the October 2015 transaction, Nebgen continued to state that he had investors who were ready to invest in Holdings and Pharma. *Id.* ¶ 46. During monthly meetings with Plaintiff and Ghahramani between October 2015 and July 2017, Nebgen gave allegedly false reports regarding the status of investor solicitations. *Id.* This was done, according to Plaintiff, to induce Plaintiff to continue his research and development in connection with the intellectual property. *Id.*

Recently, Nebgen told Plaintiff that he never intended for Plaintiff to become a shareholder of Pharma. *Id.* ¶ 56. Nebgen also demanded that Plaintiff re-subscribe for his Pharma shares. *Id.* ¶

57. Plaintiff refused, arguing that Nebgen was "changing the deal." *Id.* ¶ 58. Subsequently, Nebgen and Fayad informed Plaintiff that he was no longer an officer of TheraBrake. *Id.*[3]

Holdings has not paid on the promissory note. *Id.* ¶¶ 52, 54. Plaintiff alleges that Nebgen, Ghahramani, and Fayad "have caused" Holdings not to make the payments due. *Id.* ¶ 52. Plaintiff further alleges that Nebgen's statements regarding the availability of ready and willing investors, the necessity of transferring the intellectual property to a Swiss entity because of those investors, and that Holdings and Pharma would pay any research and development and legal costs "have all turned out to be false and were knowingly false when made." *Id.* ¶ 47.

The complaint alleges a scheme in which Defendants "continuously" misrepresented the status of investor negotiations to secure Plaintiff's investment and credit from third parties. *Id.* ¶ 90. According to the complaint, Nebgen induced Plaintiff and TheraBrake to transfer their intellectual property to Holdings and enticed Plaintiff to purchase shares in Holdings. *Id.* ¶¶ 48, 50. Plaintiff also alleges that Nebgen used Holdings to strip Plaintiff of his intellectual property by promising consideration without any intent of actually paying. *Id.* ¶ 55. It was because of the allegedly false statements that Plaintiff purchased shares of Holdings and Pharma and that TheraBrake purchased the promissory note. *Id.* ¶ 49.

The complaint also documents various expenses that have been incurred as a result of the integrated transaction, expenses which various of the Individual Defendants refuse to pay. The Individual Defendants retained counsel on behalf of Pharma and Holdings to prosecute and protect the acquired patents. *Id.* ¶ 87. Defendants have not paid for those legal services, and counsel has asserted a lien for $472,539 on the assets of Holdings. *Id.* ¶¶ 87, 90. Nebgen and Ghahramani also

---

[3] With his opposition papers, Plaintiff filed a copy of an email dated October 29, 2017, sent from Fayad to Plaintiff, which reads: "Effective immediately you are removed from the position of President, CEO and director of TheraBrake Inc. Note that effective immediately, all corporate authority to act on behalf of, bind or otherwise govern the business of the Corporation is removed from you as stated in the Written Consent of Sole Director of TheraBrake Inc." Schentag Aff., Ex. Q. Plaintiff has not filed copies of the written consents that were purportedly attached to that email. *See id.*

retained Swiss counsel to prepare the documents necessary to effectuate the transfer of the intellectual property. *Id.* ¶ 88. Nebgen and Ghahramani refuse to pay for those services, a total sum in excess of $90,000. *Id.* Nebgen and Ghahramani also retained Swiss counsel to draft the transactional documents associated with the licensing of intellectual property to an affiliated entity. *Id.* ¶ 89. They have refused to pay for those legal services, valued at over $96,000. *Id.*

Plaintiff asserts that it would be futile to move the Board of Directors of TheraBrake to bring claims on its own behalf; Nebgen and Fayad have the controlling votes. *Id.* ¶ 59.

### B. Procedural History

Plaintiff commenced this action on November 9, 2017. ECF No. 1. In a joint letter filed on January 26, 2018, Defendants advised the Court of their intent to move to dismiss the complaint. ECF No. 26. On January 31, 2018, Defendants filed an answer, stating that they were not providing a substantive response to the complaint at that time because of the anticipated motion to dismiss. ECF No. 28. Nebgen, Ghahramani, and Fayad filed counterclaims against Plaintiff. *Id.* On February 9, 2018, Defendants filed their motion to dismiss the complaint. ECF No. 33. On February 23, 2018, Plaintiff answered the counterclaims. ECF No. 38. After several extensions of time, Plaintiff filed his opposition to the motion to dismiss on March 26, 2018. ECF No. 50. Defendants replied on April 11, 2018. ECF No. 51.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a

complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

## III.   DISCUSSION

### A.  Federal Claims

Defendants move to dismiss the federal securities claims on two grounds:  (1) the Note and Plaintiff's shares in Holdings and Pharma do not constitute securities; and (2) even if those interests were securities, the complaint fails to plead a domestic transaction.

#### 1.   The Shares and Promissory Note as "Securities"

Plaintiff brings claims under Section 10(b) of the Securities and Exchange Act of 1934 and Sections 5(a) and (b)(2), 12(a) and (b), and 15(a) of the Securities Act of 1933.  Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, *in connection with the purchase or sale of any security* . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe."  15 U.S.C. § 78j(b) (emphasis added).  Thus, to state a claim under Section 10(b) for fraudulent misrepresentations, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Investors, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)).

Section 5 of the Securities Act requires that "a security" be registered with the SEC prior to its sale.  15 U.S.C. § 77e(a); *see SEC v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006).  To state a cause of action under Section 5, a plaintiff must show "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale."  *Cavanagh*, 445 F.3d at 111 n.13 (quoting *Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n.4 (2d Cir. 1998)).

Section 12 of the Securities Act imposes liability on "[a]ny person who . . . offers or sells a security in violation of section [5]" of the Act or "offers or sells a *security* . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading."  15 U.S.C. § 77l(a) (emphasis added); *see In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("Section 12(a)(2) provides . . . redress where the *securities* at issue were sold using prospectuses or oral communications that contain material misstatements or omissions" (emphasis added)).  Section 15(a) of the Securities Act imposes liability on a person who controls another person liable under Section 11 or Section 12.  *See* 15 U.S.C. § 77o(a).  To establish a claim under this section, a plaintiff must prove "a 'primary violation' of the statute 'and control of the primary violator by defendants.'" *In re MF Global Holdings Limited Sec. Litig.*, 982 F. Supp. 2d 277, 308 (S.D.N.Y. 2013) (quoting *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011)).

Thus, to avoid dismissal of his federal claims, Plaintiff must plead the threshold issue:  that the shares and promissory note at issue are "securities" within the meaning of the 1933 and 1934 Acts.  *See OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 369 (S.D.N.Y. 2005) ("A preliminary issue is whether the scheme involved 'securities,' as that term is defined by the Securities Act of 1933 . . . and the Securities and Exchange Act of 1934 . . . .").

### a.  Plaintiff's Shares in Holdings and Pharma

In determining whether LLC membership interests are "securities" under the federal acts, courts generally apply the Supreme Court's test enunciated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), to determine whether the interests constitute an "investment contract."  *See, e.g.*, *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, No. 13-cv-7204 (PAE), 2014 WL 3900565, at *7 (S.D.N.Y. Aug. 8, 2014) ("LLC membership interests are not 'securities' unless they meet the definition of an 'investment contract' . . . ." (quoting *Automated Teller Mach. Advantage LC v. Moore*, No. 08-cv-3340

(RMB), 2009 WL 2431513, at *4 (S.D.N.Y. Aug. 6, 2009))); *Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999) (noting that the plaintiff's LLC membership interests were not "securities" unless they satisfied the *Howey* criteria). The *Howey* test is met when a plaintiff alleges "[i] an investment of money [ii] in a common enterprise [iii] with profits to come solely from the efforts of others." *Automated Teller*, 2009 WL 2431513, at *4 (alterations in original) (quoting *Endico v. Fonte*, 485 F. Supp. 2d 411, 412 (S.D.N.Y. 2007)); *see also Howey*, 328 U.S. at 301 ("The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others").

The key consideration is "whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way." *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (quoting *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982)). Therefore, the *Howey* test is not satisfied if, "at the time of investment, the investor possesses a 'reasonable expectation of significant investor control.'" *Uni-World Capital*, 2014 WL 3900565, at *7 (quoting *Automated Teller*, 2009 WL 2431513, at *4). In making this determination, a court must conduct a "'case-by-case analysis' into the 'economic realities' of the underlying transaction." *Leonard*, 529 F.3d at 89 (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 62 (1990)). "The question is whether an investor, as a result of the investment agreement itself or the factual circumstances that surround it, is left unable to exercise meaningful control over his investment." *Id.* at 91 (quoting *Robinson v. Glynn*, 349 F.3d 166, 170 (4th Cir. 2003)).

Here, Plaintiff not only alleges but emphasizes that Nebgen recommended the transfer of the intellectual property to the Swiss LLCs in order to attract investors. Repeatedly, the complaint alleges that Nebgen consistently represented to Plaintiff that formation of a Swiss entity was a necessary predicate to obtaining the anticipated investment. In fact, Plaintiff alleges that he

purchased the LLC interests because Nebgen assured him that investors were ready and willing to contribute. *See* Compl. ¶¶ 46-50. These allegations suggest that, at the time Plaintiff purchased his interests, he did so with the expectation of significant passive investment in the companies.

Nevertheless, the complaint also explains that Holdings and Pharma were created "as part of" the parties' agreement to commercially exploit the relevant patents and other intellectual property. *See id.* ¶¶ 21, 23. Thus, the complaint dually suggests that the Swiss LLCs were formed with the expectation that their shareholders would actively control the companies. The Asset Purchase Agreement executed by Nebgen and Plaintiff also lends support to the latter expectation.[4] The Agreement provides for the transfer of "all assets" of TheraBrake, including all of TheraBrake's records, books, mailing lists, study materials, inventory, and "all intellectual property rights." Affirmation of Joseph M. Fayad (ECF No. 35) ("Fayad Aff."), Ex. 2 § 1.1. The Agreement also contains a non-compete clause. *See id.* § 6.4. These provisions suggest that all of TheraBrake's assets were transferred to Holdings so that the parties, through Holdings, could continue TheraBrake's work to commercially exploit the intellectual property. Although none of the assets were transferred to Pharma, the complaint describes Pharma as the entity designed to be the "operating company"; Pharma was established for the dual purpose of licensing the intellectual property and obtaining investor capital. *See* Compl. ¶ 24. The complaint itself creates a question as to whether the expectation, at the time Plaintiff purchased the LLC interests, was that shareholders would be passive investors or have an active role in controlling the companies that were to capitalize on Plaintiff's inventions.

---

[4] The Court may consider the Asset Purchase Agreement in connection with its evaluation of Defendants' motion to dismiss because the Agreement is referenced in the complaint. *See* Compl. ¶¶ 21, 37, 53, 80-82, 90; *see also Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005) ("In addition to allegations in the complaint, we also consider on a Rule 12(b)(6) motion 'any written instrument attached to [the complaint] as an exhibit,' 'any statements or documents incorporated in it by reference,' and any document not incorporated but that is, nevertheless, 'integral' to the complaint because the complaint 'relies heavily upon its terms and effect.'" (alterations in original) (quoting *Chambers*, 282 F.3d at 152-53)).

In light of these competing allegations, the Court cannot determine at this stage whether Plaintiff's membership interests in the Swiss LLCs are investment contracts and, thereby, securities under the federal securities acts.[5]  Instead, the question of "[w]hether or not [Plaintiff's] membership interests are ultimately determined to be investment contracts is more appropriately addressed in a summary judgment motion." *Automated Teller*, 2009 WL 2431513, at *4 (citation omitted); *see also Uni-World Capital*, 2014 WL 3900565, at *8 (denying motion to dismiss when court was unable to conclude based on the pleadings that "significant investor control" was expected at the time of the relevant transaction).[6]

### b. Promissory Note

In determining whether a promissory note is a security under the 1933 and 1934 Acts, "[c]ourts begin with the presumption that notes with terms exceeding nine months are securities." *United States v. Bergstein*, No. 16-cr-746 (PKC), 2018 WL 2417845, at *3 (S.D.N.Y. May 29, 2018) (citing *Reves*, 494 U.S. at 65 n.3, 70-71).  This presumption is rebuttable upon a showing that the note either falls into or resembles categories of notes that have been judicially deemed not to

---

[5] The parties have not provided the Court with true and correct copies of the LLCs' formation documents, including any operating agreements.  *See Automated Teller Mach. Advantage LC v. Moore*, No. 08-cv-3340 (RMB), 2009 WL 2431513, at *4 (S.D.N.Y. Aug. 6, 2009) (noting the need to consider "the structure of the particular LLC at issue, as provided in its operating agreement" (quoting *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 392 (D. Del. 2000))).  Appended to an exhibit of Plaintiff's affidavit in opposition to the motion to dismiss is a document entitled Articles of Association for Pharma.  *See* Affidavit of Jerome Schentag (ECF No. 49) ("Schentag Aff."), Ex. M at 45-64 (ECF docket notation).  However, Schentag's affidavit does not address this document and provides no factual basis for the Court to conclude that this document is in fact a true copy of Pharma's articles of association.  Therefore, the Court has not considered this document in evaluating the motion to dismiss.

[6] Plaintiff argues in his opposition that the shares at issue are "securities" in part because of the use of terms such as "securities" and "common stock" in various documents related to the October 2015 transaction, including the share purchase agreements.  *See* Pl.'s Mem. in Opp. (ECF No. 50) at 2-3.  The Supreme Court, however, has counseled that "in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." *United States v. Leonard*, 529 F.3d 83, 90 (2d Cir. 2008) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)); *see also SEC v. W.J. Howey Co.*, 328 U.S. 293, 300 (1946) (disregarding "the legal terminology in which . . . contracts are clothed").  Therefore, the mere fact that the parties described the interests as "securities" does not command the conclusion that they are, in fact, securities.

constitute securities. *See Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 811 (2d Cir. 1994); *Reves*, 494

U.S. at 65. Such notes include

> the note delivered in consumer financing, the note secured by a
> mortgage on a home, the short-term note secured by a lien on a small
> business or some of its assets, the note evidencing a "character loan"
> to a bank customer, short-term notes secured by an assignment of
> accounts receivable, . . . a note which simply formalizes an open-
> account debt incurred in the ordinary course of business . . . [and] notes
> evidencing loans by commercial banks for current operations.

*Leemon v. Burns*, 175 F. Supp. 2d 551, 559 (S.D.N.Y. 2001) (quoting *Reves*, 494 U.S. at 65).

In applying the *Reves* "family resemblance" test, courts consider four factors:

> (1) the motivations that would prompt a reasonable buyer and seller to
> enter into the transaction; (2) the plan of distribution of the
> instrument; (3) the reasonable expectations of the investing public; and
> (4) whether some factor, such as the existence of another regulatory
> scheme, significantly reduces the risk of the instrument, thereby
> rendering application of the securities laws unnecessary.

*Pollack*, 27 F.3d at 812 (quoting *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51, 55 (2d Cir.

1992)); *see also Reves*, 494 U.S. at 66-67. "A party asserting that a note of more than nine months

maturity is not within the 1934 Act . . . or that any note is not within the anti-fraud provisions of the

1933 Act has the burden of showing that 'the context otherwise requires.'" *Exchange Nat'l Bank of*

*Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1137-38 (2d Cir. 1976) (Friendly, J.); *accord Leemon v. Burns*,

175 F. Supp. 2d 551, 559 (S.D.N.Y. 2001).

As an initial matter, the promissory note at issue here does not fall squarely within one of the

judicially recognized classes of non-security notes. Also, the Note provides for a three-year term,

and is therefore presumptively a security. *See* Fayad Aff., Ex. 2 at 44-51[7] (the "Note").[8] Therefore,

the family resemblance test applies, and the Court must evaluate the *Reves* factors.

---

[7] In citing to the promissory note, the Court refers to the page numbers contained in the ECF docket notation.

[8] The Court may consider the promissory note in evaluating the motion to dismiss because the note is referenced in the complaint. *See* Compl. ¶¶ 43, 53, 80-81, 90; *see also supra*, n.4.

Of particular relevance to this motion is the first *Reves* factor, which "examines the motivations that would prompt reasonable parties to enter into the transaction." *Bergstein*, 2018 WL 2417845, at *4 (citing *Reves*, 494 U.S. at 66). "The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security)." *Pollack*, 27 F.3d at 812. "If the seller's purpose is to raise money for the general use of a business enterprise . . . and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Reves*, 494 U.S. at 66.

An evaluation of this factor raises serious questions about the motives underlying the issuance of the Note. Viewing the relevant transaction as the purchase of the Note by TheraBrake in exchange for the transfer of its intellectual property to Holdings, that transaction, in isolation, could be characterized as a commercial transaction. Holdings' purpose in selling the Note to TheraBrake is not alleged to have been "to raise money for the general use of a business enterprise." *Id.* Rather, Plaintiff alleges that Holdings sold TheraBrake the Note for the sole purpose of obtaining TheraBrake's intellectual property. *See, e.g.*, Compl. ¶¶ 47-50 (alleging that Nebgen's scheme was to induce Plaintiff and TheraBrake to transfer their intellectual property rights to Holdings); *id.* ¶¶ 52-53 (alleging that the money due under the note was consideration for the intellectual property transfer); *id.* ¶ 55 ("In essence, Nebgen used Holdings to defraud plaintiffs of the Intellectual Property by agreeing to pay consideration which he had no intention of paying.").

The Note itself reflects this. Section 1 explains that "[t]his Note evidences an obligation under, and is subject to the provisions of, the Asset Purchase Agreement dated October 15, 2015 . . . ." Note § 1. The Note provides for payment of the principal amount of $566,510 plus interest, *id.* at 1 & § 2, and provides that "[a]ll payments shall be made in U.S. dollars in immediately available funds," *id.* § 5. The Note is not convertible to Holdings' stock, and nowhere in the Note, the APA, or in the complaint, is there any indication that TheraBrake invested in Holdings as part of this

transaction.  Nor does the complaint allege that TheraBrake was entitled to any portion of Holdings' profits.  Rather, the Note is alleged to constitute nothing more than payment for the transfer of a business asset—the intellectual property.  An application of the first *Reves* factor, therefore, could suggest that the Note is not a security.  *See New Earthshell Corp. v. Jobookit Holdings Ltd.*, No. 14-cv-3602 (JMF), 2015 WL 1000343, at *4 (S.D.N.Y. Mar. 5, 2015) (finding that issuance of note was not motivated by investment purposes when it was issued to cover a portion of the sale of a business and the plaintiff was not alleged to be entitled to "receive equity, a percentage of [the sold business's] profits, or any other stake in the ongoing success of the business"), *vacated on other grounds*, 634 F. App'x 44 (2d Cir. 2015); *Intelligent Digital Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F. Supp. 2d 278, 284-85 (E.D.N.Y. 2010) (finding that a note issued as payment for technology was not a security when the seller of the technology did not invest in the buyer's business and the transaction could "best [be] described as the sale of technology from one business to another for a lump sum"); *cf. SEC v. Constantin*, 939 F. Supp. 2d 288, 305 (S.D.N.Y. 2013) (finding that first *Reves* factor indicated convertible note was a security when broker-dealer's clients "were motivated by a desire to invest their funds for a profitable return and were led to reasonably believe that they had indeed invested in [ ] securities").

On the other hand, if the Note is considered in light of the larger transaction—the October 2015 integrated transaction—questions arise as to the motivation of Holdings in issuing the Note. As discussed above in Section II.A.1, Plaintiff has sufficiently alleged that Holdings was formed in order to secure investment capital.  Therefore, it is reasonable to infer from the complaint that, had investment not been a motivating factor, there would have been no transfer of TheraBrake's intellectual property to Holdings, and, thus, no Note.  Viewing the issuance of the Note in this larger context, it is less clear that the exchange of the Note for TheraBrake's intellectual property was purely commercial in nature.  *See Private Corporate Advisors, Inc. v. Heard*, No. 92-cv-5952 (LAP), 1995

WL 66647, at *8 (S.D.N.Y. Feb. 17, 1995) (finding note to be a security when it was "part of a larger financing operation"). At this stage, the Court cannot readily conclude that the first *Reves* factor weighs in favor of, or against, a finding that the note is a security.

The second and third *Reves* factors weigh against the presumption that the note is a security. In evaluating the second factor, the plan of distribution, "courts consider whether the instrument involved is one which involved 'common trading for speculation or investment.'" *Roer v. Oxbridge Inc.*, 198 F. Supp. 2d 212, 224 (E.D.N.Y. 2001) (quoting *Reves*, 494 U.S. at 66). The "common trading" element may be satisfied by alleging that the note was "offered and sold to a broad segment of the public." *Reves* at 68 (citations omitted). The third factor, the "reasonable expectations of the investing public," *id.* at 66, examines whether there exists "public expectation that the notes would be traded as securities," *Benedict v. Amaducci*, No. 92-cv-5239 (KMW), 1995 WL 413206, at *10 (S.D.N.Y. July 12, 1995).

Here, Plaintiff does not allege that the Note was publicly traded, or even offered to members of the public. Rather, the Note was conveyed to TheraBrake as payment for the transfer of the company's intellectual property. Moreover, the complaint does not allege that there was an investing public, and the APA on its face reflects the expectation of "a single seller who expected only to be paid in full for an asset sale." *Intelligent Design Sys.*, 683 F. Supp. 2d at 285. Accordingly, the second and third *Reves* factors weigh against the conclusion that the Note is a security. *See id.* (concluding that *Reves* factors two and three indicated that a note was not a security when the note was not offered to "a broad segment of the public" but instead was issued as payment in a single transaction for the purchase of an asset). Nonetheless, a note may be deemed a security even when the plan of distribution weighs against such a finding. *See Fragin v. Mezei*, No. 09-cv-10287 (AJN), 2012 WL 3613813, at *10 (S.D.N.Y. Aug. 22, 2012); *Jaquith v. Newhard*, No. 91-cv-7503 (PKL), 1993 WL 127212, at *10 (S.D.N.Y. Apr. 20, 1993).

With respect to the fourth *Reves* factor, Defendants have pointed to no risk-reducing factors outside of the federal securities laws. Therefore, this factor weighs in favor of finding that the Note is a security. *See Fragin*, 2012 WL 3613813, at *11.

Weighing these factors, the Court cannot readily determine that the Note is a security. This is particularly the case because of the complaint's competing allegations with respect to the motive underlying the Note's issuance. Nonetheless, the Court need not conclusively decide this issue because, as discussed below, Plaintiff has failed to plead that the note was issued in connection with a domestic transaction.

### 2. Extraterritoriality of the Transaction

In *Morrison v. Nat'l Australia Bank Ltd.*, the Supreme Court held that Section 10(b) of the Exchange Act applies only to "transactions in securities listed on domestic exchanges[ ] and domestic transactions in other securities." 561 U.S. 247, 267 (2010). "With regard to securities *not* registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales . . . ." *Id.* at 268; *accord Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012).

Although *Morrison* did not further define a domestic transaction, the Second Circuit addressed that issue in *Absolute Activist*. There, the Second Circuit held that "transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist*, 677 F.3d at 67. "'[I]rrevocable liability' attaches 'when the parties to the transaction are committed to one another,' or, 'in the classic contractual sense, there was a meeting of the minds of the parties.'" *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 66 (2d Cir. 2018) (quoting *Absolute Activist*, 677 F.3d at 68). Thus, to determine whether the Exchange Act reaches a transaction not involving securities traded on a U.S. exchange, the relevant inquiry is "the location of the securities *transaction*." *City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 180 (2d Cir. 2014). That location falls within

the United States when a purchaser agrees "to take and pay for a security" in the United States or when the seller agrees "to deliver a security" in this country. *Absolute Activist*, 677 F.3d at 68. "Relevant 'facts concerning the formation of the contracts, the placement of purchase orders, . . . or the exchange of money' should be considered." *Giunta v. Dingman*, ___ F.3d ___, 2018 WL 3028686, at *4 (2d Cir. June 19, 2018) (quoting *Absolute Activist*, 677 F.3d at 70). "[A] purchaser's citizenship or residency does not affect" this inquiry. *City of Pontiac*, 752 F.3d at 181 (citation omitted).

The Second Circuit has applied the *Morrison* test to claims brought under both the Securities Act and the Exchange Act. *See In re Petrobras Sec.*, 862 F.3d 250, 259 (2d Cir. 2017) (noting that noteholders were "entitled to assert claims under the Exchange Act and the Securities Act if they [could] show that they acquired their Notes in 'domestic transactions'" (quoting *Morrison*, 561 U.S. at 267)), *petition for cert. docketed*, No. 17-664 (Nov. 3, 2017).

Here, Plaintiff does not argue, nor does the complaint allege, that title in the securities passed within the United States. Rather, Plaintiff contends that he has plausibly alleged that he and TheraBrake incurred irrevocable liability for the purchase of the LLC interests and Note within this country. For the reasons that follow, the Court disagrees.

### a. Plaintiff's Purchase of Shares in Pharma and Holdings

The complaint provides little information with respect to the location of the relevant events.[9] Plaintiff alleges that he met with Nebgen "numerous times" in New York City "to discuss his inventions of drugs and devices." Compl. ¶ 30. Plaintiff also alleges that, on January 8, 2013, the

---

[9] In an affidavit submitted in opposition to the motion to dismiss, Plaintiff sets forth additional facts regarding the locations of several pre-transaction meetings and the manner in which he received and executed the share purchase agreements. *See* Schentag Aff. The Court cannot properly consider Plaintiff's affidavit in connection with this motion. *See Chambers*, 282 F.3d at 152-53 (explaining that, on a motion to dismiss, a court may consider documents attached to the complaint, documents incorporated in the complaint by reference, and documents that are "integral" to the complaint).

two men met again, this time in San Francisco, and discussed Nebgen's ability to secure investment in Plaintiff's intellectual property. *Id.* ¶ 31-32. During that meeting, Nebgen explained the benefit of forming a Swiss entity and the need to transfer the intellectual property to that entity. *Id.* ¶ 33. The complaint then explains that Plaintiff met with Nebgen in New York City on some unspecified date after the San Francisco meeting. *Id.* ¶ 34. Plaintiff describes the subject of that meeting to have been "a venture to commercially exploit his and TheraBrake's patents, trademarks and intellectual property." *Id.*

These meetings alone, however, do not plausibly plead that this was a domestic transaction. *See Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 541 (S.D.N.Y. 2013) ("While potentially relevant under conduct and effects test, courts have found such pleadings that 'some acts that ultimately result in the execution of the transaction abroad [took] place in the United States amounts to nothing more than the reinstatement of the conducts test.'" (alteration in original) (quoting *Pope Invs. II, LLC v. Deheng Law Firm*, No. 10-cv-6608 (LLS), 2012 WL 3526621, at *8 (S.D.N.Y. Aug. 15, 2012))); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 625-26 (S.D.N.Y. 2010) (noting that "read as a whole, the *Morrison* options indicate that the Court considered that under its new test § 10(b) would not extend to foreign securities trades executed on foreign exchanges even if purchased or sold by American investors, and even if some aspects of the transaction occurred in the United States"). At no point during those meetings does Plaintiff allege that he came to an agreement with Nebgen about the terms of the transaction. Plaintiff does not allege, for example, that it was during those meetings that he agreed to become a shareholder in the Swiss entity. Nor does the complaint allege that Plaintiff, on behalf of TheraBrake, agreed at that time that it would accept a promissory note in exchange for its intellectual property. Accordingly, neither Plaintiff or TheraBrake is alleged to have incurred irrevocable liability during any of those meetings. *Cf. Giunta*, 2018 WL 3028686, at *4 (finding meetings in New York provided basis for domestic transaction

when the plaintiff agreed during those meetings to invest capital in exchange for an equity stake in a Bahamian company).

Plaintiff's other argument—that his signing of the share purchase agreements in New York[10] and his wiring of funds from a New York bank establish a domestic transaction—is equally handicapped. First, it is reasonable to infer from Plaintiff's allegations and the language of each share purchase agreement ("SPA") that Plaintiff's original purchases of shares in Pharma and Holdings were consummated the year *before* he executed the share purchase agreements. The SPA that Plaintiff executed in connection with his Holdings shares, signed by Plaintiff on September 23, 2016, states that, "[o]n the occasion of the *incorporation* of [Holdings] . . . Purchaser [Plaintiff] had paid in an amount of CHF 7,000.00 into [Holdings] ("Capital Contribution") for 70 [Holdings] Shares and by this received beneficial ownership of those Shares." Affidavit of Jerome Schentag (ECF No. 49) ("Schentag Aff."), Ex. E, Preamble § 2 (emphasis added). That SPA also provides that it is merely a transfer of "legal ownership" in the shares already held by Plaintiff. *Id.* It is clear that Plaintiff had paid for those shares at the time of the integrated transaction in 2015. *See id.*; Compl. ¶ 39. No additional payment was required of him at the time he executed the SPA. *See* Schentag Aff., Ex. E § 1 ("The Purchaser pays the purchase price by way of set-off against Purchaser's claim against Seller for reimbursement of the Capital Contribution in the amount of CHF 7,000.00."). Similarly, the Pharma SPA, signed by Plaintiff on December 21, 2016, states that, "[o]n the occasion of the incorporation of the Company . . . Purchaser paid in an amount of CHF 13,293.00 into the Company ("Capital Contributions") for 26,586 Shares, and, thus, received beneficial ownership of those Shares as of the incorporation of the Company, i.e. as of 30 October

---

[10] Plaintiff relies on his affidavit testimony to establish that he executed the share purchase agreements in New York. *See* Pl.'s Opp. at 6. While the Court has no basis for considering the averments in that affidavit, it may consider the share purchase agreements themselves, which are referenced in the complaint. *See* Compl. ¶ 57; *see also, e.g.*, *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). Those documents indicate that Plaintiff executed each agreement in New York. *See* Schentag Aff., Ex. E at 5, Ex. L at 5.

2015." Schentag Aff., Ex. L, Preamble § (b). Plaintiff alleges in the complaint that he paid for those shares by wire transfer on October 14, 2015. Compl. ¶ 39.

Based on these facts, it appears that Plaintiff's original interests in the LLCs were acquired in October 2015, at or around the same time as the consummation of the integrated transaction.[11] There is no information in the complaint, however, regarding Plaintiff's location when he agreed to the terms of that transaction, or the place in which the transaction took place. Nor do the APA and other related agreements indicate their place of execution. *See* Fayad Aff., Ex. 2. Moreover, the vague and unspecific allegations in the complaint regarding the October 2015 transaction say nothing about the purchase of shares in the Swiss LLCs other than to allege that Plaintiff, Nebgen, and Fayad "became shareholders in Pharma." Compl. ¶ 37. On these allegations, the Court is unable to infer from the complaint that Plaintiff became "irrevocably bound" to purchase his shares in the United States. *Absolute Activist*, 677 F.3d at 70.

Plaintiff's allegation that he paid for his shares by wiring money from a New York bank is also insufficient to establish a domestic transaction. The Second Circuit has held that allegations that investors transferred money to or between U.S. bank accounts, without more, are insufficient to satisfy *Morrison*. *See Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (concluding that a "direction to wire transfer money to the United States is insufficient to demonstrate a domestic transaction" because the wire transfers "were actions needed to carry out the transactions, and not the transactions themselves"); *see also MBC Fin. Servs. Ltd. v. Boston Merchant Fin., Ltd.*, No. 15-cv-275 (DAB), 2016 WL 5946709, at *11 (S.D.N.Y. Oct. 4, 2016) (citing *Loginovskaya* and rejecting

---

[11] The parties offer no argument with respect to any distinction in the *Morrison* analysis that may exist based on the transaction granting Plaintiff "beneficial" ownership versus "legal" ownership of the shares. The complaint alleges that Plaintiff became a shareholder in Pharma as part of the October 2015 transaction. Compl. ¶ 37. Therefore, for purposes of this motion, the Court accepts that Plaintiff became a Pharma shareholder at the time of Pharma's formation. Based on the representations in the Holdings SPA, the Court likewise infers the same with respect to Plaintiff's shares in Holdings.

argument that the wiring of funds to a New York bank account by itself established a domestic transaction).

In addition to the "original" shares in Holdings and Pharma, the Pharma SPA describes an additional 211 shares that Plaintiff was to purchase for the price of CHF 105.50. Schentag Aff., Ex. L § 1. The Court is unable to infer, however, that Plaintiff ever purchased those shares, much less that he did so in the United States. The complaint is silent as to the total numbers of shares that Plaintiff purchased in Pharma. While the complaint does allege that Plaintiff wire-transferred a second payment for his Pharma shares on December 23, 2016, two days after he signed the SPA, that payment was in the amount of $13,798.00. Compl. ¶ 39. The SPA makes clear that Plaintiff's original Pharma shares were paid for by a "set-off" against his original capital contributions; no previously unpaid money was to exchange hands. Schentag Aff., Ex. L § 1. Only the 211 additional shares were to be paid for by wire transfer to the seller's bank account, and the only payment due for those shares was CHF 105.50, approximately $103.53.[12] *See id.* Therefore, it is entirely unclear what shares Plaintiff purchased by paying $13,798 in December 2016. Without additional information regarding that transaction, the Court cannot conclude that Plaintiff has adequately pleaded that he incurred irrevocable liability for his purchase of any additional Pharma shares within the United States.

### b. TheraBrake's Purchase of the Note

As with the LLC membership interests, the Court is unable to conclude at this time that Plaintiff has adequately pleaded that TheraBrake's purchase of the Note was a domestic transaction. As discussed above, the complaint offers no facts regarding the location of the October 2015

---

[12] The exchange rate on December 31, 2016 between the Swiss Franc and the U.S. Dollar was CHF 1.0190 to 1 USD. *See* U.S. Dep't of the Treasury, Bureau of the Fiscal Service, *Treasury Reporting Rates of Exchange: Historical Rates, December 31, 2016*, https://fiscal.treasury.gov/fsreports/rpt/treasRptRateExch/historicalRates.htm (last visited June 15, 2018).

integrated transaction. The APA's provisions offer no additional insight. The APA details the terms of closing of "the transactions contemplated by" the APA, which included the issuance of the Note. Fayad Aff., Ex. 2 at 2-17[13] (the "APA"), Art. III. Those provisions say nothing with respect to the location in which closing deliveries were to be made. *See id.* §§ 3.2, 3.3. Nor does the APA indicate the location of Plaintiff and Nebgen at the time of its execution; it states their respective addresses, but not the loci of execution. *See id.* at 17. The Note itself likewise contains no indication of the location at which it was executed. The signature line, containing Nebgen's signature, merely indicates that Nebgen signed the Note on behalf of Holdings, "a Swiss limited company." Note at 8. Absent more specific allegations regarding the whereabouts of the parties when they agreed to the APA's terms, the Court is left unable to infer that the Note was acquired by TheraBrake in a domestic transaction.

For all of these reasons, Defendants' motion to dismiss Plaintiff's federal securities claims is granted.

## B. State Law Claims

The Court has original jurisdiction over this case under 28 U.S.C. § 1331 (federal question jurisdiction) and under 28 U.S.C. § 1332 (diversity jurisdiction). Accordingly, despite the dismissal of all of the federal claims, the Court must evaluate Defendants' arguments in favor of dismissal of the state law claims as well.

### 1. Personal Jurisdiction over the Corporate Defendants

Defendants move to dismiss the state law claims against Holdings and Pharma for lack of personal jurisdiction. It is well established that, on a motion to dismiss pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against

---

[13] The pages cited are those listed on the ECF docket notation.

whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (Sotomayor, J.) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." (citation omitted)). To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). At the pleading stage—and prior to discovery—a plaintiff need only make a *prima facie* showing that jurisdiction exists. *Id.* at 84-85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015) ("'In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.'" (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013))).

If the court considers only pleadings and affidavits, the plaintiff's *prima facie* showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)). If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding

the contrary presentation by the moving party." *Seetransport Wiking*, 989 F.2d at 580 (citation omitted).

### a. Standard for Exercising Personal Jurisdiction

Federal courts must satisfy three requirements in order to exercise personal jurisdiction over an entity:  (1) the entity must have been properly served, (2) the court must have a statutory basis for exercising personal jurisdiction, and (3) the exercise of personal jurisdiction must comport with constitutional due process.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 59-60 (2d Cir. 2012).  In a federal question case, the manner in which district courts assess whether the exercise of personal jurisdiction comports with constitutional due process varies depending on the asserted statutory basis.

"The constitutional analysis under the Due Process Clause consists of two separate components:  the 'minimum contacts' inquiry and the 'reasonableness' inquiry.  The 'minimum contacts' inquiry requires [the court] to consider 'whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction.'"  *Id.* at 60 (quoting *Chloe*, 616 F.3d at 164).  Although the Second Circuit has not "has not yet decided" whether to adopt this approach, other circuits have held that "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole."  *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014) (collecting cases).  Courts in this district have followed this approach. *See, e.g.*, *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) ("When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, however, the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." (internal quotation marks and citations

omitted)); *Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541, 548 (S.D.N.Y. 2005), *aff'd*, 332 F. App'x 643 (2d Cir. 2009) ("If a federal statute provides for nationwide service of process, the jurisdictional reach of an enforcing court is at its fullest—its analysis is limited only by the requirements of due process, and it may consider a party's contacts with the United States as a whole, rather than with the forum state."); *see also Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *42 (S.D.N.Y. Feb. 21, 2017) (examining nationwide contacts in an action alleging CEA and Sherman Act violations); *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 526 (S.D.N.Y. 2008); *Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1312 (S.D.N.Y. 1986) ("Section 12 [of the Clayton Act] is construed as conferring nationwide personal jurisdiction over corporate antitrust defendants."), *aff'd*, 859 F.2d 148 (2d Cir. 1988).

If the federal statute at issue does not provide for nationwide service, or if the claim does not arise under federal law, the personal jurisdiction analysis begins by applying the forum state's long-arm statute. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) ("In a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules 'if the federal statute does not specifically provide for national service of process.'" (quoting *Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir. 1990))). If the long-arm statute is satisfied, the due process inquiry examines whether the foreign defendant has sufficient minimum contacts with the forum state. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 370 (2d Cir. 1997).

Whether personal jurisdiction is based on a statute containing nationwide service or a state-long arm statute, the court must also determine that the exercise of personal jurisdiction comports with the Due Process Clause.[14] "[D]ue process requires a plaintiff to allege (1) that a defendant has

---

[14] Depending on the basis for personal jurisdiction, due process under either the Fifth or Fourteenth Amendment applies. "[T]he due process analysis is basically the same under both the Fifth and Fourteenth Amendments. The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the

'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks*, 714 F.3d at 673 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). As discussed above, the "relevant forum" for the purpose of the contacts analysis may be the forum state (here, New York) or the United States as a whole.

"To determine whether a defendant has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *Id.* (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996)). "A court may assert general personal jurisdiction over a foreign defendant to hear any and all claims against that defendant only when the defendant's affiliations with the State in which the suit is brought 'are so constant and pervasive as to render [it] essentially at home in the forum State.'" *Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (alteration in original) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014)). "'Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see also Licci,* 732 F.3d at 170 ("'Where the claim arises out of, or relates to, the defendant's contacts with the forum—*i.e.*, specific jurisdiction [is asserted]—minimum contacts [necessary to support such jurisdiction] exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there.'" (alterations in original) (quoting *Bank Brussels*, 305 F.3d at 127)).

Specific personal jurisdiction is predicated on "an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum."

---

United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered." *Chew v. Dietrich,* 143 F.3d 24, 28 n.4 (2d Cir. 1998); *see also S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) ("[B]ecause the language of the Fifth Amendment's due process clause is identical to that of the Fourteenth Amendment's due process clause, the same general principles guide the minimum contacts analysis.").

*Goodyear*, 564 U.S. at 919 (internal quotation marks, alteration, and citations omitted). "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id.* (citation omitted). A plaintiff must plead personal jurisdiction with respect to each claim asserted. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). "[T]he relationship must arise out of contacts that the 'defendant *himself*' creates with the forum . . . ." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis in *Walden*). "The activities of plaintiffs or third parties alone will not confer jurisdiction, and the court's analysis is directed to the defendant's contacts with the forum itself and 'not the defendant's contacts with persons who reside there.'" *Sullivan*, 2017 WL 685570, at *43 (quoting *Walden*, 134 S. Ct. at 1122).

Specific jurisdiction over a foreign defendant may also exist even if the relevant conduct took place entirely outside the forum. Under the so-called "effects test," personal jurisdiction is "typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173; *see also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007) (describing "independent, if conceptually overlapping, methods of demonstrating minimum contacts," including on the basis of "in-state effects of out-of-state activity"). For such claims, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant *expressly aimed its conduct at the forum*." *Licci*, 732 F.3d at 173 (emphasis added) (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983). Harmful effects alone will not establish jurisdiction: "[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *Waldman*, 835 F.3d at 339 (quoting *In re Terrorist Attacks*, 714 F.3d at 674). "[T]he defendant must 'expressly aim' his conduct at the United States." *Id.* at 337 (alterations omitted) (citing *Licci*, 732 F.3d at 173); *see also In re Libor-Based Fin. Instruments Antitrust*

*Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 4634541, at *27 (S.D.N.Y. Aug. 4, 2015) (concluding that effects in forum did not support personal jurisdiction over a foreign defendant when "there [wa]s no suggestion, and it [did] not stand to reason, that foreign defendants aimed their manipulative conduct at the United States or any particular forum state"), *amended sub nom. In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015).

In addition, the underlying "suit-related conduct must create a substantial connection with the forum State." *Walden*, 134 S. Ct. at 1121. "[I]t is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* at 1122. Therefore, the analysis necessarily includes consideration of the claims' elements and where the conduct occurred. *See Waldman*, 835 F.3d at 335-39. The forum must be the "focal point" or "nucleus" of plaintiff's alleged harm. *Id.* at 340. Continuous presence in the forum does not confer specific jurisdiction unless that presence involves "suit-related conduct." *Id.* at 335; *see also 7 W. 57th Street Realty Co., LLC v. Citigroup, Inc.*, No. 13-cv-981 (PGG), 2015 WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015) ("Plaintiff must demonstrate that the Foreign Banks' *suit-related* conduct creates minimum contacts with New York, however, not simply that the Foreign Banks have a presence here or conduct business activities here in general." (citing *Walden*, 134 S. Ct. at 1121).

If the contacts are not sufficient, the due process inquiry ends. *See Metro. Life Ins.*, 84 F.3d at 568. If the court has either general or specific jurisdiction, it must turn to the second step of the due process inquiry, and determine "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Licci*, 673 F.3d at 60 (quoting *Chloe*, 616 F.3d at 164). The "reasonableness" analysis requires district courts to evaluate the following five factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining

convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Chloe,* 616 F.3d at 164-65 (citing *Asahi Metal Indus., Co., Ltd. v. Superior Court of Cal.,* 480 U.S. 102, 113-14 (1987)).

### b. Statutory Basis for Personal Jurisdiction

Although Defendants move to dismiss any state law claims against both Pharma and Holdings on the basis of the Court's lack of personal jurisdiction, Plaintiff asserts no state claims against Pharma. The common law fraud claim is based on representations made by Nebgen and Ghahramani, and the complaint does not allege that those representations were made on behalf of the corporate Defendants. *See* Compl. ¶¶ 74-78.[15] The breach of fiduciary duties claim is brought against the Individual Defendants. *See id.* ¶¶ 84-90.[16] And the remaining breach of contract claim, while seeking remedies that involve rescission of "all agreements" that Plaintiff entered into with Defendants, is asserted against Holdings, the party to the contract. *See id.* ¶¶ 79-83. Therefore, the Court must evaluate only its jurisdiction over Holdings.

Neither party contends that Holdings is subject to the general jurisdiction of New York courts. Rather, Plaintiff's arguments under N.Y. C.P.L.R. § 302 suggest that he believes the Court to have specific jurisdiction over the Swiss LLC.[17]

---

[15] The complaint explains that, after Holdings and Pharma were formed, Nebgen continued to make the same misrepresentations regarding the availability of investors that he had prior to the LLCs' formation. Compl. ¶ 46. Plaintiff stops short, however, of pleading that Nebgen made these statements on behalf of Pharma or Holdings. *Cf. Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 105 (2d Cir. 2001) (finding allegations that individual defendant was the agent of the corporate defendants and was acting on their behalf when he disseminated the allegedly false or misleading statements sufficient to plead fraud on the part of the corporate defendants).

[16] In his opposition, Plaintiff also clarifies, to the extent there were any confusion, that the breach of fiduciary duties claim is asserted only against the Individual Defendants. Pl.'s Opp. at 11.

[17] In New York courts, general jurisdiction is exercised pursuant to C.P.L.R. § 301 and is proper when "a company has engaged in such a continuous and systematic course of 'doing business' that a finding of its 'presence' [in New York] is warranted." *Sonera Holdings B.V. v. Cukurova Holding A.S.,* 750 F.3d 221, 224 (2d Cir. 2014) (citation omitted). Here, New York courts lack general jurisdiction over Holdings. According to the complaint, Holdings is a Swiss LLC, formed in Switzerland and with its principal place of business in Switzerland. Compl ¶ 20. While Nebgen is alleged to have

Under Section 302 of the C.P.L.R., New York's long-arm statute, "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state . . . ; or (3) commits a tortious act without the state causing injury to person or property within the state . . . ." N.Y. C.P.L.R. 302(a). Here, Plaintiff does not specifically identify the subsection of Section 302 under which he believes jurisdiction is appropriate. However, Plaintiff points to various "facts" in support of personal jurisdiction in this state. Those facts relate to Holdings' contract negotiations and investment solicitation in New York and include: (1) Holdings' execution of the APA with a New York-based company, and TheraBrake's related acquisition of a "worthless" promissory note, (2) Nebgen's sending of the Holdings SPA to Plaintiff in New York for his signature, (3) the assignments of patents by Plaintiff, Fayad, and another entity, Therasyn, to TheraBrake in New York, as part of the integrated transaction, (4) the negotiation of the APA and related contracts via email and telephone between Plaintiff in New York on behalf of TheraBrake and Nebgen on behalf of Holdings, (5) Nebgen's repeated solicitation of investments in New York on behalf of Holdings, (6) Nebgen's signing of the Bioventure Term Sheet in New York City on behalf of Holdings, (7) Nebgen's retention in New York, on behalf of Holdings, of the China Merchants Bank for the "proposed issuance, offering and sale . . . of approximately $30 million of equity securities . . . on a private placement basis," and (8) the transfer of one-third of TheraBrake's shares to Nebgen and Nebgen's assumption of his role as a director and officer of that company. Pl.'s Mem. in Opp. (ECF No. 50) ("Pl.'s Opp.") at 8-10.[18] Based on Plaintiff's reliance on these facts, it appears that Plaintiff understands the basis for personal jurisdiction under the long-

---

conducted meetings on behalf of Holdings in New York City, *see id.* ¶ 25, there is no allegation that Holdings' contacts with New York have been "continuous or systematic." *Sonera Holdings*, 750 F.3d at 224; *see also Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016).

[18] Many of these asserted facts are not pleaded in the complaint.

arm statute as Holdings' transaction of business within the state.

Jurisdiction is appropriate under section 302(a)(1) when a foreign defendant "transacts any business within the state" and "the claim arises from those business transactions." *Sunward Elecs.*, 362 F.3d at 22 (quoting N.Y. C.P.L.R. § 302(a)(1)). Under Section 302(a)(1), New York courts may exercise jurisdiction over a foreign defendant who has "purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws . . . . [A] single transaction would be sufficient to fulfill this requirement, so long as the relevant cause of action also arises from that transaction." *Bank Brussels*, 171 F.3d at 787 (alterations in original) (internal quotation marks and citations omitted); *accord Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005).

The Second Circuit has instructed that several factors should be considered in determining whether a defendant transacts business in New York. Those include:

> (1) whether the defendant has an on-going contractual relationship with a New York corporation; (2) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (3) what the choice-of-law clause is in any such contract; and (4) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward Elecs.*, 362 F.3d at 22 (quoting *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996)). No single factor is dispositive, however, and a finding of personal jurisdiction must be based on the totality of the circumstances. *Agency Rent A Car*, 98 F.3d at 29. "The test [under C.P.L.R. § 302(a)(1)] is hardly a precise one; the court must look at the aggregation of defendant's activities, coupled with the selective weighing of the various actions." *Eastboro Foundation Charitable Tr. v. Penzer*, 950 F. Supp. 2d 648, 658 (S.D.N.Y. 2013) (alteration in original) (quoting *Rolls-Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F. Supp. 1040, 1050-51 (S.D.N.Y. 1987)).

Ultimately, "in order to sustain jurisdiction, there must be some transaction attributable to the one sought to be held *which occurs in New York*." *Bank Brussels*, 171 F.3d at 787 (quoting *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280, 284 (1970)) (emphasis in *Bank Brussels*).

"New York courts place 'special emphasis on the locale of contract negotiations' when analyzing contracting activity for § 302(a)(1) purposes." *Sherwin-Williams Co. v. C.V.*, No. 14-cv-6227 (RA), 2016 WL 354898, at *2 (S.D.N.Y. Jan. 28, 2016) (quoting *Jarolim v. Akris Inc.*, No. 14-cv-3361 (AT), 2015 WL 5821094, at *5 (S.D.N.Y. Sept. 9, 2015)); *see Grand River Enterprises*, 425 F.3d at 166-67 ("[T]he transacts-business standard can be satisfied where both the negotiations and execution of a contract took place within New York." (citing *George Reiner & Co. v. Schwartz*, 41 N.Y.2d 648, 652-53 (1977))). Indeed, "courts have held that New York-based contractual negotiations can by themselves constitute the transaction of business in New York under Section 302(a)(1) if they substantially advanced or were substantively important or essential to the formation of the contract." *Body Beautiful, Inc. v. Fred Hayman Beverly Hills, Inc.*, No. 96-cv-8541 (MBM), 1997 WL 527784, at *4 (S.D.N.Y. Aug. 25, 19977) (internal citation and quotation marks omitted); *see also Sherwin-Williams*, 2016 WL 354898, at *3 (collecting cases).

Here, Plaintiff fails to make a prima facie showing that personal jurisdiction over Holdings is appropriate under New York's long-arm statute. Plaintiff alleges that Nebgen met with him in New York to discuss the anticipated integrated transaction at some point after their January 8, 2013 San Francisco meeting. Compl. ¶¶ 31, 34. The complaint implies that this meeting took place prior to September 2014. *See id.* ¶¶ 34-35. At that point, however, Holdings had not yet been formed. It was not until September 16, 2015 that Holdings was organized in Switzerland—one month before the integrated transaction was consummated, including the signing of the APA and issuance of the Note. There are no allegations that during that month Holdings, or anyone acting on behalf of Holdings, took any action in New York to finalize negotiations of the APA. Nor does the

complaint allege that Holdings assumed liability for Nebgen's representations made prior to the company's formation, or that it could have assumed such liability under Swiss law. Moreover, the complaint stops short of alleging that the APA was executed in New York. Rather, Plaintiff only avers that *he* signed the patent assignments, assigning the rights of Plaintiff, Fayad, and TheraSyn to TheraBrake, in Buffalo. *See* Schentag Aff. ¶ 6.[19] New York's long-arm statute requires in-state action by the defendant, however. *See Bank Brussels*, 171 F.3d at 787. With no factual assertions that Holdings negotiated or executed the APA within New York, the APA provides no independent basis for a conclusion that Holdings transacted business in this state.

An analysis of the *Sunward Electronics* factors yields a similar result. With respect to the first factor, neither the complaint nor Plaintiff's affidavit present facts showing an ongoing business relationship between Holdings and TheraBrake, or any other New York corporation. "[T]emporary, random, or tenuous relationships with the forum" will not suffice. *Agency Rent A Car*, 98 F.3d at 30. Thus, "a single short-term contract" is insufficient to constitute an "ongoing contractual relationship." *Sandoval v. Abaco Club on Winding Bay*, 507 F. Supp. 2d 312, 317 (S.D.N.Y. 2007) (collecting cases). Rather, the out-of-state defendant must have had a continuous business relationship with the New York entity. *See, e.g.*, *Agency Rent A Car*, 98 F.3d at 30 (finding ongoing contractual relationship when defendants had "done constant business with" the New York entity for more than three decades); *George Reiner & Co., Inc. v. Schwartz*, 41 N.Y.2d 648, 653 (1977) (finding personal jurisdiction appropriate in part because the parties' establishment of a four-year employment relationship constituted a "continuing relationship between the parties").

The APA provides for a single exchange, TheraBrake's intellectual property for the Note. While performance under the Note remained outstanding (Holdings was to make four annual

---

[19] Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

payments to TheraBrake), performance under the APA was completed in 2015. This contract, therefore, created a temporary and tenuous relationship to New York. *See Duff v. Phelps Sec., LLC v. Wisniewski*, No. 16-cv-7226 (VEC), 2017 WL 2880849, at *3 (S.D.N.Y. July 5, 2017) ("Courts within the Second Circuit have repeatedly concluded there is no 'ongoing contractual relationship' where the contract at issue is the only transaction between the parties."); *Mortgage Funding Corp. v. Boyer Lake Pointe, L.C.*, 379 F. Supp. 2d 282, 287 (E.D.N.Y. 2005) (finding that one contract did not establish an ongoing contractual relationship); *cf. Gordian Grp., LLC v. Syringa Exploration, Inc.*, 168 F. Supp. 3d 575, 586 (S.D.N.Y. 2016) (examining cases and noting that "courts in this district have found personal jurisdiction where parties' communications were part and parcel of an extended relationship involving multiple transactions or the provision of services over multiple years" (citation omitted). Plaintiff points to no facts that would suggest that the relationship between Holdings and TheraBrake extended beyond the APA transaction. Therefore, the lack of a continuous business relationship weighs against a finding that Holdings transacted business in New York for jurisdictional purposes.[20]

Turning to the second factor, the Court has already found insufficient support to show that Holdings negotiated or executed the APA in New York. In addition, there are no allegations that Holdings, or Nebgen on Holdings' behalf, visited New York after execution of the APA for purposes related to Holdings' relationship with TheraBrake. The complaint alleges vaguely that, "[s]ince late October 2015 and continuing to date, Nebgen has conducted business for Holdings and Pharma in meetings held in New York City." Compl. ¶ 25. Plaintiff's affidavit expands on this allegation, listing a handful of meetings that Nebgen attended in New York after the October 2015

---

[20] Plaintiff's affidavit suggests that Holdings, through Nebgen, may have met with other entities in New York for the purpose of transacting business. *See* Schentag Aff. ¶¶ 28-32. Those averments, however, do not speak to the nature of any relationship developed between Holdings and the other entities. Nor do they establish that the other entities are in fact New York businesses.

transaction.  *See* Schentag Aff. ¶¶ 28-32.  Plaintiff provides few details regarding those meetings.

They appear, however, to be related to securing investment in the Swiss LLCs, not to the contractual

relationship created by the APA or to Holdings' obligations thereunder.  Because the only state

claim asserted against Holdings is for breach of the APA, Holdings' activities in New York unrelated

to that agreement cannot satisfy the long-arm statute for purposes of this action.  *See Grand River*,

425 F.3d at 166; *see also Bank Brussels*, 171 F.3d at 787 (explaining the requirement that the plaintiff's

cause of action must arise from the defendant's New York business transactions).  Therefore, the

second factor also weighs against a finding of personal jurisdiction under the long-arm statute.

The third factor—the choice-of-law provision—additionally weighs against jurisdiction in

New York.  The APA provides that it is governed by Delaware law.  *See* APA § 7.1.  So does the

Note.  *See* Note § 19.  *See Sunward Elecs.*, 362 F.3d at 23 (explaining that, although not dispositive, a

choice of law clause is "a significant factor in a personal jurisdiction analysis because the parties, by

so choosing, invoke the benefits and protections of [the agreed-upon state's] law").

The fourth factor is the only factor that serves to tip the scale in favor of personal

jurisdiction.  Under the APA, any notices from Holdings to TheraBrake are to be sent to

TheraBrake at 100 Crosby Boulevard, Eggertsville, New York.  APA § 7.8 & at 16.  The Note

similarly sets the Eggertsville address as the address at which Holdings was to send any notice to

TheraBrake.  Note § 9.  The Note further provides that all payments thereunder are to be made to

TheraBrake at the same New York address.  Note §§ 5, 9.  Of course, Plaintiff pleads that Holdings

made no payment under the Note.  Nonetheless, by the contract's terms, this factor lends some

weight in favor of a finding that Holdings transacted business in New York.  But it does not tip the

scale far enough.

Weighing all of the *Sunward Electronics* factors, there is simply an insufficient basis on which

to find that Holdings, a Swiss LLC with a principal place of business in Switzerland, purposefully

availed itself of doing business in New York, or that any such purposeful availment gave rise to the breach of contract claim at issue here.[21]  Because the long-arm statute is not satisfied, the Court need not determine whether an exercise of personal jurisdiction would comport with constitutional due process requirements.

### 2. Breach of Contract Claim

Defendants argue that Plaintiff improperly seeks rescission of his agreements with Defendants other than Holdings, the only Defendant to have executed the APA.  Defendants also assert that Plaintiff is barred from bringing the breach of contract claim derivatively on behalf of TheraBrake because he inadequately pleads demand futility.  Because the Court lacks personal jurisdiction over Holdings, the breach of contract claim is dismissed.  The Court need not resolve the parties' dispute regarding the appropriateness of the remedies sought.  Likewise, the Court need not determine whether Plaintiff has satisfied the demand requirements to bring a derivative suit on behalf of TheraBrake.

### 3. Breach of Fiduciary Duties

A federal court sitting in diversity must apply the choice of law rules of the forum state.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012).  Under New York law, the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation.  *Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980) (citing *Diamond v. Oreamuno*, 24 N.Y.2d 494 (1969)); *see also John Swann Holding Corp. v. Simmons*, 62 F. Supp. 3d 304, 309 (S.D.N.Y. 2014).  Holdings and Pharma were formed in Switzerland as Swiss LLCs.  Therefore, Swiss law governs any claims for breach of fiduciary duties brought by Plaintiff against

---

[21] Plaintiff's opposition references additional contacts with New York by Nebgen on behalf of Holdings.  *See* Pl.'s Opp. at 9-10.  Those contacts include the retention of the New York City branch of China Merchants Bank in connection with a private offering of equity securities to investors residing in China, Nebgen's and Ghahramani's other unspecified solicitation of investors in New York, and the execution of the Bioventure Term Sheet in New York City.  These contacts are unrelated to the breach of contract claim, and the claim asserted against Holdings does not arise in connection with these contacts.

the other members of those entities. Defendants' briefing, however, relies entirely on New York law. *See* Defs.' Mem. (ECF No. 34) at 17-19.

"[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997). If "[t]he parties' briefs assume that New York substantive law governs the issues . . . such implied consent is, of course, sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)); *see also Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 323 (S.D.N.Y. 2014) (collecting cases). "[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984). Therefore, had Plaintiff's opposition brief also relied on New York law, an analysis of the breach of fiduciary duties claim under New York law may have been appropriate. However, Plaintiff raises no legal argument in opposition, and instead merely contends that Defendants mischaracterize his claim. *See* Pl.'s Opp. at 11. In the absence of substantive briefing by Plaintiff, it is not apparent that the parties agree that New York law should govern this claim.

Because Defendants have presented no argument as to why Plaintiff's claim for breach of fiduciary duties is insufficiently pleaded under Swiss law, the Court is unable to evaluate the adequacy of the complaint's allegations. Accordingly, Plaintiff's breach of fiduciary duties claim survives.

### 4. Common Law Fraud

Under New York law, a plaintiff asserting common law fraud must allege: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably

relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (per curiam) (citing *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996)). "A claim for common law fraud is subject to the particularity requirements of Federal Rule of Civil Procedure 9(b)." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402-03 (2d Cir. 2015). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

Defendants first argue that the complaint fails to plead misstatements by Fayad and Ghahramani. Plaintiff concedes this point and simply requests leave to amend in this regard. Pl.'s Opp. at 8. The Court observes that the complaint asserts a common law fraud claim only against Nebgen and Ghahramani, not against Fayad. *See* Compl. ¶¶ 74-78. Nonetheless, the parties are correct: the complaint fails to plead with particularity any misstatements made by Fayad or Ghahramani.

With respect to the fraud claim against Nebgen, Defendants argue that the complaint fails to raise a strong inference of scienter. The Court agrees. The scienter element of common law fraud "is essentially the same as that under federal securities laws." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 446 (S.D.N.Y. 2014) (quoting *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010)). Although Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), a plaintiff must "allege facts giving rise to 'a strong inference of fraudulent intent,'" *Novak*, 216 F.3d at 306 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

"The requisite 'strong inference' of fraud may be established either by (a) alleging facts to show that the defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *see also In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 481 (S.D.N.Y. 2013). "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *SEC v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) (quoting *Shields*, 25 F.3d at 1130). "In the securities fraud context," the Second Circuit has "typically found it sufficient to state a claim based on recklessness if the complaint 'specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Novak*, 216 F.3d at 308). Nonetheless, "conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b)." *Shields*, 25 F.3d at 1129.

Here, Plaintiff alleges the following false statements by Nebgen: (1) that Nebgen "had and has investors willing to invest," (2) that "it was necessary to transfer the Intellectual Property to a Swiss company (Holdings) because of these investors," and (3) that "Holdings and Pharma would pay for all costs of research, development, [and] legal fees and costs." Compl. ¶ 47. Defendants aptly argue that the allegation that these statements "were false when made and were made with knowledge of their falsity," *id.* ¶ 76, is conclusory and insufficient to raise a strong inference of fraudulent intent. *See, e.g.*, *Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 542 (S.D.N.Y. 2007) (finding that complaint failed to plead scienter when it alleged only that the statements at issue were "incorrect or should have been known by [the defendants] to be incorrect"). Apart from the conclusory statement that the statements were false when made, Plaintiff pleads no specific facts

showing that Nebgen knew the statements were false when made or was otherwise reckless in not knowing. *See Coronel v. Quanta Capital Holdings Ltd.*, No. 07-cv-1405 (RPP), 2009 WL 174656, at *27 (S.D.N.Y. Jan. 26, 2009) (noting that "to establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made" (quoting *Silva Run Worldwide Ltd. v. Bear Stearns & Co.*, No. 96-cv-5102 (WK), 2000 WL 1672324, at *4 (S.D.N.Y. Nov. 6, 2000))). The complaint provides no facts, for example, that show that Nebgen either had no investors willing and ready to invest, or that Nebgen had contacted investors but that those investors had not yet decided on whether to invest in the intellectual property.

Similarly, the complaint fails to explain why the statement that those investors would only be attracted to a Swiss entity was false. In fact, the complaint plausibly alleges that investors would prefer to invest in a Swiss company because of the personal tax benefits to them, a fact that mitigates against the falsity of Nebgen's statement. Compl. ¶ 33. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (explaining that a plaintiff adequately alleges a "strong inference" of scienter "only if a reasonable person would deem the inference of scienter cogent and *at least as compelling as* any opposing inference one could draw from the facts alleged" (emphasis added)).

Finally, the complaint alleges that Holdings and Pharma have refused to assume the costs of research and development (and related legal expenses), but alludes to no facts that would suggest that Nebgen's *representation* that the companies would cover those costs was false at the time it was made. *See Coronel*, 2009 WL 174656, at *27; *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 336 (S.D.N.Y. 2011) (emphasizing, in pleading circumstantial evidence of fraud, the need for a showing that "specific contradictory information [ ] was available to the defendants [ ] *at the same time* they made their misleading statements").

Because of Plaintiff's failure to raise a strong inference of Nebgen's fraudulent intent, and Plaintiff's failure to plead the misstatements attributable to any other Individual Defendant, the common law fraud claim is dismissed.

## IV. CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss the complaint is GRANTED in part and DENIED in part.

Plaintiff's claims under the Securities Act and the Exchange Act are dismissed without prejudice.

Plaintiff's common law fraud claim is dismissed without prejudice.

Plaintiff's breach of contract claim is dismissed without prejudice.

Plaintiff's breach of fiduciary duties claim survives.

Plaintiff is granted leave to replead those claims that have been dismissed without prejudice no later than thirty (30) days following the date of this order. *See Rutolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (noting that leave to amend is "liberally granted").

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 33.

SO ORDERED.

Dated: June 21, 2018
New York, New York

                            GREGORY H. WOODS
                       United States District Judge