**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEROME SCHENTAG, individually and derivatively on behalf of THERABRAKE, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>GEORG NEBGEN, PARVIZ GHAHRAMANI, VOLANT HOLDINGS GMBH, VOLANT PHARMA AG and JOSEPH M. FAYAD,<br><br>Defendants. | **No.: 17-cv-8734 (GHW)**<br><br>**ANSWER TO AMENDED COMPLAINT WITH <u>COUNTERCLAIMS</u>** |

Defendants Georg Nebgen, Volant Holdings GmbH, Volant Pharma AG and Joseph Fayad, by their undersigned attorneys, as and for their answer to the amended complaint of Plaintiff Jerome Schentag, and with Counterclaim-Plaintiff Parviz Ghahramani, as and for their counterclaim against Plaintiff Jerome Schentag, respectfully allege as follows:

## ANSWER TO THE AMENDED COMPLAINT

1.     Deny the allegations in paragraph 1 of the amended complaint.

2.     Deny the allegations in paragraph 2 of the amended complaint.

3.     Deny the allegations in paragraph 3 of the amended complaint.

4.     Deny the truth of the allegations in paragraph 4 of the amended complaint.

5.     Admit, upon information and belief, the allegations in paragraph 5 of the amended complaint.

6.     Admit, upon information and belief, the allegations in paragraph 6 of the amended complaint.

7.     Admit, upon information and belief, the allegations in paragraph 7 of the amended complaint.

8.     Admit, upon information and belief, the allegations in paragraph 8 of the amended complaint.

9.     Admit the allegations in paragraph 9 of the amended complaint.

10.     Deny the allegations of paragraph 10 of the amended complaint, except admit that Dr. Fayad became a 50% shareholder of TheraBrake.

11.     Deny the allegations in paragraph 11 of the amended complaint, except admit that Dr. Nebgen is a resident of Switzerland.

12.     Admit the allegations in paragraph 12 of the amended complaint.

13.     Deny the allegations in paragraph 13 of the amended complaint, except admit that Dr. Nebgen did not pay any money to purchase shares in TheraBrake.

14.     Admit the allegations in paragraph 14 of the amended complaint.

15.     Admit the allegations in paragraph 15 of the amended complaint.

16.     Deny the allegations of paragraph 16 of the amended complaint, except admit that Volant Holdings GmbH was intended to act as an instrumentality of the joint venture formed by and among Schentag, Nebgen and Fayad.

17.      Deny the allegations of paragraph 17 of the amended complaint, except admit that, in furtherance of their joint venture, Schentag, Nebgen and Fayad caused TheraBrake to enter into an Asset Purchase Agreement dated October 15, 2015, with Volant Holdings GmbH, and further admit that, in furtherance of their joint venture, Schentag, Nebgen and Fayad caused other documents to be signed, and respectfully refer the Court to all said documents for a true and complete statement of their terms and provisions.

18.     Admit the truth of the allegations in paragraph 18 of the amended complaint.

19.     Deny the allegations of paragraph 19 of the amended complaint, except admit that Volant Pharma AG was intended to act as an instrumentality of the joint venture formed by and among Schentag, Nebgen and Fayad.

20.     Deny the allegations in paragraph 20 of the amended complaint, except admit that Volant Holdings GmbH was intended to hold certain intellectual property on behalf of the joint venture formed by and among Schentag, Nebgen

and Fayad, and that Volant Pharma AG was intended to be an operating company on behalf of the joint venture formed by and among Schentag, Nebgen and Fayad.

21.     Deny the truth of the allegations in paragraph 21 of the amended complaint, except admit that, in furtherance of the joint venture formed by and among Schentag, Nebgen and Fayad, each of them is a shareholder of Volant Holdings GmbH.

22.     Deny the truth of the allegations in paragraph 22 of the amended complaint.

23.     Deny the truth of the allegations in paragraph 23 of the amended complaint, except respectfully refer the legal conclusions asserted therein to the Court for resolution.

24.     Deny the truth of the allegations in paragraph 24 of the amended complaint, except respectfully refer the legal conclusions asserted therein to the Court for resolution.

25.     Deny the truth of the allegations in paragraph 25 of the amended complaint, except respectfully refer the legal conclusions asserted therein to the Court for resolution.

26.     Deny the truth of the allegations in paragraph 26 of the amended complaint, except respectfully refer the legal conclusions asserted therein to the Court for resolution.

27.     Deny the truth of the allegations in paragraph 27 of the amended complaint, except admit that ileal hormones have a role in modulating blood sugar and insulin levels, and further admit that Dr. Fayad has made observations and conducted research into the effect of ileal hormones.

28.     Deny the allegations in paragraph 28 of the amended complaint.

29.     Deny the allegations in paragraph 29 of the amended complaint, except admit that Dr. Fayad entered into an agreement with New Science Holdings, LLC, dated August 28, 2008, and respectfully refer the Court to said agreement for a true and complete statement of its terms and provisions.

30.     Deny the allegations in paragraph 30 of the amended complaint, except admit that New Science Holdings, LLC entered into an agreement with WLNS, LLC, and respectfully refer the Court to said agreement for a true and complete statement of its terms and provisions.

31.     Deny the allegations in paragraph 31 of the amended complaint.

32.     Admit the allegations in paragraph 32 of the amended complaint.

33.     Deny the allegations in paragraph 33 of the amended complaint, except admit that Dr. Fayad caused the '991 patent application to be filed, and further admit that said patent application was assigned to New Science Holdings, LLC, and further admit that Schentag did not contribute to said patent application.

34.     Deny the allegations in paragraph 34 of the amended complaint, except admit that Dr. Fayad had discussions with Schentag and Jerome Snyder in or about December 2009 and in 2010 relating to Dr. Fayad's inventions.

35.     Deny the allegations in paragraph 35 of the amended complaint, except admit that in 2010 Dr. Fayad and Schentag discussed Dr. Fayad's work on his inventions.

36.     Deny the allegations in paragraph 36 of the amended complaint, except admit that Dr. Fayad's inventions were based, in part, on his clinical observations and other information.

37.     Deny the allegations in paragraph 37 of the amended complaint.

38.     Deny the allegations in paragraph 38 of the amended complaint, except admit that Dr. Fayad assigned certain intellectual property to TheraBrake by an assignment dated as of August 15, 2013, which was subsequently filed with the US Patent and Trademark Office, and respectfully refer the Court to said assignment for a true and complete statement of its terms and provisions.

39.     Deny the allegations in paragraph 39 of the amended complaint.

40.     Deny the allegations in paragraph 40 of the amended complaint, except admit that TheraBrake and Volant Holdings GmbH entered into an agreement whereby Volant Holdings GmbH acquired TheraBrake's rights in and to certain technology, and respectfully refer the Court to said agreement for a true and complete statement of its terms and provisions.

41.     Deny the allegations in paragraph 41 of the amended complaint, except admit that between 2009 and 2013 Schentag and Dr. Fayad discussed Dr. Fayad's inventions and their joint venture intended to exploit his inventions, and further admit that Dr. Fayad fully disclosed to Schentag his prior dealings with New Science Holdings, LLC and WLNS, LLC.

42.     Deny the allegations in paragraph 42 of the amended complaint, except admit that in or about February 2011, Dr. Fayad and Schentag formed a joint venture to exploit commercially Dr. Fayad's inventions, and further admit that Dr. Fayad and Schentag agreed that each would he a 50% member of the joint venture and any corporate entities formed to pursue that venture.

43.     Deny the allegations in paragraph 43 of the amended complaint, except admit upon information and belief that Schentag caused TheraBrake to be formed on or about April 8, 2011, and further admit that TheraBrake was formed

fore the purpose of carrying out the joint venture between Dr. Fayad and Schentag to exploit Dr. Fayad's inventions.

44.     Deny the allegations in paragraph 44 of the amended complaint, except admit that, in furtherance of their joint venture, a shareholders agreement between Dr. Fayad and Schentag and an assignment agreement were drafted and signed in 2013.

45.     Deny the allegations in paragraph 45 of the amended complaint.

46.     Deny the allegations in paragraph 46 of the amended complaint.

47.     Deny the allegations in paragraph 47 of the amended complaint, except admit that Dr. Fayad entered into an assignment agreement with TheraBrake in 2013, and further admit that in 2013 Dr. Fayad entered into a Shareholders Agreement with Schentag as the shareholders of TheraBrake, and respectfully refer the Court to said agreements for a true and complete statement of their respective terms and conditions.

48.     Deny the allegations in paragraph 48 of the amended complaint.

49.     Deny the allegations in paragraph 49 of the amended complaint.

50.     Deny the allegations in paragraph 50 of the amended complaint, except admit that between 2010 and 2012, Schentag and Dr. Nebgen met and discussed various matters.

51.     Deny the allegations in paragraph 51 of the amended complaint, except admit that Schentag and Dr. Nebgen met at a conference in California in January 2013, and further admit that Schentag discussed his desire to commercially exploit certain intellectual property with Dr. Nebgen at that meeting.

52.     Deny the allegations in paragraph 52 of the amended complaint, except admit that from time to time in 2013 and 2014 Schentag discussed his desire to commercially exploit certain intellectual property with Dr. Nebgen, and further admit that in those discussions, Schentag sought to interest Dr. Nebgen in joining the joint venture as its chief executive officer to commercially exploit said intellectual property.

53.     Deny the allegations in paragraph 53, except admit that in 2013 and at other times Schentag and Dr. Nebgen discussed various ways in which to go about building a reputable company in order to attract investors in and financing for the development of certain intellectual properties that Schentag claimed to control.

54.      Deny the allegations in paragraph 54 of the amended complaint, except admit that between 2013 and 2016, Schentag and Dr. Nebgen met in New York City, and communicated by telephone and otherwise, to discuss Schentag's desire to commercially exploit certain intellectual property, and further admit that, after Dr. Nebgen became a member of the joint venture previously formed by Dr. Fayad and Schentag to exploit Dr. Fayad's inventions, Dr. Nebgen and Schentag met in New York City, and communicated by telephone and otherwise, to pursue their said venture, and further admit upon information and belief that, on or about the dates specified in subparagraphs 'a' through 'q', Dr. Nebgen and Schentag participated in meetings with various potential investors and discussed with each other the business of the joint venture including, among other topics, obtaining investments in or financing of Dr. Fayad's inventions from potential third-party sources of said investment or financing.

55.      Deny the allegations in paragraph 55 of the amended complaint, except admit that in 2013 and 2014, Schentag told Dr. Fayad that he was seeking to obtain possible investments in or financing of Dr. Fayad's inventions, and further admit that at some point Schentag told Dr. Fayad that he was having discussions with Dr. Nebgen about joining the joint venture, and further admit that Schentag, Dr. Fayad and Dr. Nebgen entered into a joint venture in which each was an equal member to commercially exploit Dr. Fayad's inventions, and further admit that

10

Schentag, Dr. Fayad and Dr. Nebgen used TheraBrake and other instrumentalities to pursue their said joint venture.

56.     Deny the allegations in paragraph 56 of the amended complaint.

57.     Deny the allegations in paragraph 57 of the amended complaint.

58.     Deny the allegations in paragraph 58 of the amended complaint.

59.     Deny the allegations in paragraph 59 of the amended complaint, except admit that the parties exchanged and signed various agreements and other documents for the purpose of carrying out their joint venture, and deny knowledge or information sufficient to form a belief as to the place where Schentag was located when he signed any such documents or took any other action referred to in said paragraph 59.

60.     Deny the allegations in paragraph 60 of the amended complaint.

61.     Deny the allegations in paragraph 61 of the amended complaint, except admits that Schentag and Dr. Nebgen communicated frequently between October 2015 and July 2017 with respect to the joint venture in which each was a member.

62.     Deny the allegations in paragraph 62 of the amended complaint.

63.     Deny the allegations in paragraph 63 of the amended complaint.

64.     Deny the allegations in paragraph 64 of the amended complaint, and respectfully refer the Court to the parties' joint venture and the agreements executed in furtherance of it for a true and complete statement of their terms and conditions.

65.     Deny the allegations in paragraph 65 of the amended complaint.

66.     Deny the allegations in paragraph 66 of the amended complaint.

67.     Deny the allegations in paragraph 67 of the amended complaint.

68.     Deny the allegations in paragraph 68 of the amended complaint, except admit that Dr. Nebgen asked Schentag to execute certain documents pursuant to applicable Swiss corporate regulations.

69.     Deny the allegations in paragraph 69 of the amended complaint, except admit that Dr. Fayad informed Schentag that he had been removed as the president and a director of TheraBrake.

70.     Deny the allegations in paragraph 70 of the amended complaint, except admit that Dr. Nebgen received communications in October 2017 from Schentag asserting various claims and demanding various remedies.

71.     Deny the allegations in paragraph 71 of the amended complaint, except admit that in 2017, Schentag was removed as an officer and director of

TheraBrake, and further admit that Dr. Fayad and Dr. Nebgen were thereafter the only directors of TheraBrake.

72.     Deny the allegations in paragraph 72 of the amended complaint, except admit that in 2017, Schentag was removed as an officer and director of TheraBrake, and further admit that Dr. Fayad and Dr. Nebgen were thereafter the only directors of TheraBrake.

73.     Deny the allegations in paragraph 73 of the amended complaint.

74.     In response to paragraph 74 of the amended complaint, Defendants repeat and reallege their answers to the allegations incorporated therein by reference.

75.     Deny the allegations in paragraph 75 of the amended complaint, except admit that in or about February 2011, Schentag and Dr. Fayad formed a joint venture, in which each was an equal member, to exploit commercially Dr. Fayad's inventions.

76.     Deny the allegations in paragraph 76 of the amended complaint.

77.     Deny the allegations in paragraph 77 of the amended complaint.

78.     Deny the allegations in paragraph 78 of the amended complaint.

79.     Deny the allegations in paragraph 79 of the amended complaint.

80.     Deny the allegations in paragraph 80 of the amended complaint.

81.     Deny the allegations in paragraph 81 of the amended complaint.

82.     Deny the allegations in paragraph 82 of the amended complaint.

83.     In response to paragraph 83 of the amended complaint, Defendants repeat and reallege their answers to the allegations incorporated therein by reference.

84.     Deny the allegations in paragraph 84 of the amended complaint, except admit that in or about February 2011, Schentag and Dr. Fayad formed a joint venture, in which each was an equal member, to exploit commercially Dr. Fayad's inventions.

85.     Deny the allegations in paragraph 85 of the amended complaint.

86.     Deny the allegations in paragraph 86 of the amended complaint.

87.     Deny the allegations in paragraph 87 of the amended complaint.

88.     Deny the allegations in paragraph 88 of the amended complaint.

89.     Deny the allegations in paragraph 89 of the amended complaint.

90.     Deny the allegations in paragraph 90 of the amended complaint.

91.     Deny the allegations in paragraph 91 of the amended complaint, except admit that in or about February 2011, Schentag and Dr. Fayad formed a joint venture, in which each was an equal member, to exploit commercially Dr. Fayad's inventions.

92.     Deny the allegations in paragraph 92 of the amended complaint.

93.     Deny the allegations in paragraph 93 of the amended complaint.

94.      Deny the allegations in paragraph 94 of the amended complaint.

95.     Deny the allegations in paragraph 95 of the amended complaint.

96.     Deny the allegations in paragraph 96 of the amended complaint.

97.     In response to paragraph 97 of the amended complaint, Defendants repeat and reallege their answers to the allegations incorporated therein by reference.

98.     Deny the allegations in paragraph 98 of the amended complaint, except admit that in or about 2014, Nebgen became an equal member of the joint venture thereto formed by Schentag and Dr. Fayad to exploit commercially Dr. Fayad's inventions.

99.     Admit the allegations in paragraph 99 of the amended complaint.

100.    Deny the allegations in paragraph 100 of the amended complaint.

101.    Deny the allegations in paragraph 101 of the amended complaint.

102.    Deny the allegations in paragraph 102 of the amended complaint.

103.    Deny the allegations in paragraph 103 of the amended complaint.

104.    Deny the allegations in paragraph 104 of the amended complaint.

105.    Deny the allegations in paragraph 105 of the amended complaint.

106.    Deny the allegations in paragraph 106 of the amended complaint.

107.    In response to paragraph 107 of the amended complaint, Defendants repeat and reallege their answers to the allegations incorporated therein by reference.

108.    Deny the allegations in paragraph 108 of the amended complaint, except refer the legal conclusions alleged therein to the Court for determination.

109.    Deny the allegations in paragraph 109 of the amended complaint.

110.    Deny the allegations in paragraph 110 of the amended complaint.

111.    Deny the allegations in paragraph 111 of the amended complaint.

112.    In response to paragraph 112 of the amended complaint, Defendants repeat and reallege their answers to the allegations incorporated therein by reference.

113.    Deny the allegations in paragraph 113 of the amended complaint.

114.    Deny the allegations in paragraph 114 of the amended complaint, except refer the legal conclusion therein to the Court for determination.

115.    In response to paragraph 115 of the amended complaint, Defendants repeat and reallege their answers to the allegations incorporated therein by reference.

116.    Deny the allegations in paragraph 116 of the amended complaint.

117.    Deny the allegations in paragraph 117 of the amended complaint.

118.    Deny the allegations in paragraph 118 of the amended complaint, except refer the legal conclusions therein to the Court for determination.

119.    Deny the allegations in paragraph 119 of the amended complaint, except refer the legal conclusions therein to the Court for determination.

120.    In response to paragraph 120 of the amended complaint, Defendants repeat and reallege their answers to the allegations incorporated therein by reference.

121.    Deny the allegations in paragraph 121 of the amended complaint, and respectfully refer the Court to the parties' joint venture and the agreements

executed in furtherance of it for a true and complete statement of their terms and conditions.

122.    Deny the allegations in paragraph 122 of the amended complaint.

123.    Deny the allegations in paragraph 123 of the amended complaint.

124.    Deny the allegations in paragraph 124 of the amended complaint.

125.    In response to paragraph 125 of the amended complaint, Defendants repeat and reallege their answers to the allegations incorporated therein by reference.

126.    Deny the allegations in paragraph 126 of the amended complaint, except admit that Schentag advanced $7,500.00 to Dr. Fayad in 2015.

127.    Deny the allegations in paragraph 127 of the amended complaint.

128.    Deny that allegations in paragraph 128 of the amended complaint.

129.    Deny the allegations in paragraph 129 of the amended complaint.

130.    In response to paragraph 130 of the amended complaint, Defendants repeat and reallege their answers to the allegations incorporated therein by reference.

131.    Deny the allegations in paragraph 131 of the amended complaint.

132.     Deny the allegations in paragraph 132 of the amended complaint.

## AFFIRMATIVE DEFENSES

133.     Some or all of the claims in the amended complaint are barred by the applicable statutes of limitations.

134.     The claims in the complaint seeking equitable relief are barred by laches.

135.     The claims in the amended complaint are barred by waiver, in that Schentag was fully advised of all pertinent facts relating to the ownership of Dr. Fayad's inventions before entering in to the joint venture with Dr. Fayad in 2011, and was fully advised of the facts relating to the ownership of Dr. Fayad's inventions in 2013 when he and Dr. Fayad entered into various agreements relating to TheraBrake.

136.     The claims in the amended complaint are barred by estoppel, in that Schentag was fully advised of all pertinent facts relating to the ownership of Dr. Fayad's inventions before entering in to the joint venture with Dr. Fayad in 2011, was fully advised of the facts relating to the ownership of Dr. Fayad's inventions in 2013 when he and Dr. Fayad entered into various agreements relating to TheraBrake, and as between himself and Dr. Fayad, was the party who decided

upon the strategy for dealing with potential claims by New Science Holdings,

LLC,  WLNS,  LLC or the Snyders to an interest in Dr. Fayad's inventions.

137.    The claims in the amended complaint are barred by Schentag's

knowing and purposeful participation in the actions about which he is now suing.

## AS AND FOR A COUNTERCLAIM AGAINST PLAINTIFF BY DEFENDANTS NEBGEN, GHAHRAMANI AND FAYAD.

138.    This Court has subject matter jurisdiction over these counterclaims

pursuant to 28 U.S.C. § 1332, in that Plaintiff is a citizen and resident of New

York; Defendants and Counterclaim Plaintiffs Nebgen, Ghahramani and Fayad are

citizens of Germany, New Jersey and Nevada, respectively; and the amount in

controversy, exclusive of interest and costs, exceeds $75,000; and 28 U.S.C.

§ 1367, in that the counterclaim asserts claims under state law forming part of the

same case or controversy as (i) Plaintiffs' claims against Defendants, and

(ii) Defendants' counterclaim with respect to one or more patents.

139.    This Court also has jurisdiction over these counterclaims pursuant

to 28 U.S.C §§ 1331 and 1338, and 35 U.S.C § 256, in that the counterclaim seeks

relief with respect to correcting the inventorship of one or more patents arising

under the laws of the United States relating to patents.

140.    This Court has jurisdiction over the Counterclaim-Defendant,

Schentag, based upon Schentag's having brought his claims against the

Counterclaim-Plaintiffs in this Court.  Venue is proper in this Court for the same reason.

## The Facts

**A.**          **Dr. Fayad's research on the "ileal brake".**

141.    Fayad is a medical doctor who has conducted research since the 1970s on metabolic syndrome.  His studies have been directed particularly to the stimulation of ileal hormones, the effects of ileal hormones, and delivery mechanisms to the ileal region (the lowest portion of the small intestine). According to the Mayo Clinic, "metabolic syndrome is a cluster of conditions — increased blood pressure, high blood sugar, excess body fat around the waist, and abnormal cholesterol or triglyceride levels — that occur together, increasing [an individual's] risk of heart disease, stroke and diabetes."

142.    Hormones produced at the ileum inhibit upper gastrointestinal transit and gastropancreatic secretion.  This "ileal brake," also known as "metabolic brake," is a feedback mechanism by which the ileum signals the body, through hormones, to slow gastric emptying, reduce food intake, and to be sated (*i.e.*, stop eating) when food reaches it.  In addition to reducing food intake and, thus, potentially, body weight, the upregulation of ileal brake hormones increases homeostasis, the regulation of blood sugar and insulin in a manner consistent with

the suppression/reduction of insulin resistance and an increase in glucose tolerance. Among individuals suffering from insulin resistance, which increases the risk of developing prediabetes and Type-2 diabetes, sugars are not properly transported into cells, causing sugar outside of cells to build up.  Ileal hormones are found to modulate blood sugar and insulin levels, even among individuals suffering from insulin resistance.

143.   Fayad's research has focused on systems employing ileal hormones to treat various disorders and, especially, to trigger the production of ileal hormones using an enterically-coated capsule containing an ileum hormone-stimulating amount of a nutritional substance for release in the ileum.  The challenge of this research, among other things, was to find a way to enable this nutrient payload to travel through the digestive tract without being digested before reaching the ileum.  Fayad accomplished this through extensive invitro and clinical trials using capsules containing a glucose payload, coated with food-grade coatings to determine the coating properties required to allow a capsule to resist dissolving in the more acidic stomach and upper small intestine, but to dissolve and release a substantial portion of its payload at the pH levels of the ileal region.  In mid-2008, Fayad conducted intensive trials on coatings, including inner and outer coatings (known as "bi-phasic enteric coatings") with the property of dissolving at different

points of the digestive tract.  All of the foregoing research and clinical trials (the "Fayad Technology") were performed by Fayad in Las Vegas, Nevada.

144.    On March 3, 2010, Fayad filed a provisional patent application, No. 61/309,991 ("'991 PPA"), to cover aspects of the Fayad Technology, a copy of the relevant section of which is annexed hereto as Exhibit 1.

**B.**            **Formation of the Joint Venture with Schentag.**

145.    Upon information and belief, Schentag was simultaneously pursuing a separate line of research in New York State.  The subject of Schentag's research was set forth in a provisional patent application, No. 61/254,373 ("'373 PPA"), a copy of the relevant section of which is annexed as Exhibit 2 hereto, he filed on October 23, 2009 with Scott J. Monte of West Seneca, New York and Frank V. Bright of Williamsville, New York.  According to the "Summary of the Invention" of the '373 PPA: "This invention relates to a novel method for diagnosis and personalized treatment of patients with Type 2 diabetes on the Glucose Supply Side, in particular to a method for the testing of a patients [sic] breath and blood for biomarkers to determine the status of Type 2 diabetes for purposes of calculation and choosing and adjusting treatment with reference to the Glucose Supply Side algorithm, and the processes using the results of said testing to design Glucose Supply Side treatments for the treatment of Type 2 diabetes

mellitus and cardiovascular conditions associated with diabetes mellitus."  The words "ileum," "pH," "coating," and other terminology at the heart of the Fayad Technology appear nowhere in the '373 PPA, which had nothing to do with the Fayad Technology.

146.    After the filing of Fayad's '991 PPA, Schentag became aware of Fayad's research and the Fayad Technology, and sought to gain access to it.  Upon information and belief, to gain such access, Schentag signed a "Confidentiality & Non-Disclosure Agreement" with an entity Fayad was then using to conduct his research and develop products.  Upon gaining access to Fayad's work, Schentag was impressed with it, and proposed working together with Fayad to conduct research, and develop and sell pharmaceutical products.

147.    Specifically, Schentag proposed a 50/50 joint venture (the "Joint Venture") with Fayad in which Fayad would conduct most aspects of research. For his part Schentag would conduct most aspects of the patent process; provide funding for and seek additional sources of funding for the patent work and related activities; and pursue opportunities to exploit the products developed through Fayad's research.  The 50/50 proposition applied to both profit and loss. Schentag's plan was further to create individual corporate entities to be operated by the Joint Venture, each corporate entity corresponding to an individual pharmaceutical product flowing from the Fayad Technology, based on his belief

that this was a proven successful approach to the development of pharmaceutical products in the pharmaceutical industry.

148. Fayad and Schetag agreed to form the Joint Venture incorporating those terms, and Fayad acted in accordance with it, to wit, freely sharing the Fayad Technology with Schentag, and not pursuing other new ventures or development plans for the Fayad Technology.

**C.        Schentag breaches his duties to the Joint Venture.**

149. Unbeknown to Fayad, however, Schentag set about almost immediately breaching his fiduciary duties to the Joint Venture. On October 25, 2010, Schentag, Monte and Bright filed a non-provisional patent application, No. 12/911,497 ("'497 NPPA"), a copy of the relevant section of which is annexed hereto as Exhibit 3, claiming priority to the '373 PPA. Fayad was not listed as an inventor on the '497 NPPA, which was assigned to a company in which Fayad has never had an interest, TheraSyn Sensors, Inc. Yet, the '497 NPPA was replete with disclosure and claims, added to the content of the '373 PPA, that were taken directly from Fayad's research on coated glucose capsules designed to remain intact through the upper part of the small intestine to dissolve and release their payload in the ileum, *i.e.*, the Fayad Technology.

150.    Schentag not only filed the '497 NPPA improperly omitting Fayad as in inventor and misappropriating the Fayad Technology belonging to the Joint Venture, but prosecuted the '497 NPPA based on the Fayad Technology.  In an Office action dated May 16, 2012, the Patent Office rejected the '497 NPPA under 35 U.S.C. § 101 (patentable subject matter).  To overcome the rejection, Schentag amended the claims of the '497 NPPA to limit all of them to an invention that included the Fayad invention of administering enterically coated glucose capsules designed to dissolve in the pH 7.0 environment of the ileum.  A copy of the Office action response amending the claims is annexed hereto as Exhibit 4.  For example, what had previously been dependent Claim 7 of the '497 NPPA became the first independent claim (*see*, last three lines):[1]

---

[1] Strike-throughs indicate deleted text; underscore indicates added text.

*Claims*

1. - 6. (cancelled)

7.      (currently amended) A method for ~~determining modulation of~~ lowering cardiovascular risk for a Type 2 diabetic ~~patient~~ who is being treated with at least one anti-diabetes drug, the method comprising:

obtaining from the Type 2 diabetic a first biological sample at a first time point, and from the first biological sample

a) determining one or more physiological parameters ~~from the Type 2 diabetic at a first time point~~ and a ratio of a Glucose Supply Index (S) to an Insulin Demand Index (D) ~~as set forth in claim 1~~ by determining (S) for the Type 2 diabetic patient calculated as follows:

1 + [aggregate of carbohydrate exposure (CE) + hepatic glucose uptake (HGU) + hepatic gluconeogenesis (GNG) and + insulin resistance (IR) for the at least one drug],

and (D) calculated as follows:

1 + [aggregate of peripheral glucose uptake (PGU) + peripheral insulin exposure (PIE) for the at least one drug];

to obtain an S/D ratio for the at least one drug in the Type 2 diabetic patient;

b) assign a first cardiovascular risk score for the ~~individual~~ Type 2 diabetic patient by summing values for one or more physiological parameters in ~~the~~ look-up table provided in Figure 6 and the S/D ratio;

c) obtaining a second biological sample at a second time point from the Type 2 diabetic and repeat steps a) and b) ~~after a period of time~~ for the second biological sample to obtain a second cardiovascular risk score;

d) comparing the first cardiovascular risk score to the second cardiovascular risk score ~~wherein a lower second cardiovascular risk score compared to the first cardiovascular risk score is indicative of a reduced risk of cardiovascular disease, and wherein a higher second cardiovascular risk score compared to the first cardiovascular risk score is indicative of an increased risk of cardiovascular disease~~ and determining from the comparing that the Type 2 diabetes patient is at greater cardiovascular risk, and administering to the Type 2 diabetes patient a drug,  wherein the drug is pH-encapsulated glucose, wherein glucose is released at or above pH of 7.0.

151.   Counsel for Schentag, Monte and Bright accompanied the proposed claim amendments submitted to the Patent Office with the following remarks (*see*, Exhibit 5; emphasis supplied):

*Rejections under 35 U.S.C. 101*

Applicants respectfully disagree with the contention that the original claims were directed to non-statutory subject matter.  However, as noted above, solely in an effort to

27

expedite prosecution of the instant application, claims 1-6 and 8-10 are cancelled with this paper and claims 7 and 11 have been amended.  With the amendment to claim 7 it is respectfully submitted that the presently claimed subject matter is patentable and that the instant case is readily distinguishable from the cited holding in *Mayo v. Prometheus Laboratories*.  This is at least because the instant claims now encompass materially more limitations than just detection of certain parameters and making a determination of a relationship between the parameters and a suitable drug combination for the treatment of Type 2 diabetes.  Instead, **the claims now require administration of pH-encapsulated glucose to a Type 2 diabetic, and as such add an additional step that is sufficient to transform the nature of the claims**. In this regard, Applicants submit that administration of glucose to a Type 2 diabetic as a therapeutic agent is in no way part of what is well understood, routine conventional activity previously engaged in by those skilled in the art.  Rather, administration of pH-encapsulated glucose to a Type 2 diabetic for purposes of lowering cardiovascular risk of said diabetic is counterintuitive to conventional wisdom surrounding treatment of this disorder.  Thus, Applicants submit the presently recited claims are free from the holding in *Mayo v. Prometheus Laboratories* and are accordingly clearly directed to patentable subject matter.  The Examiner is respectfully requested to reconsider the stated rejection and allow the claims and [sic] presently presented.

152.   The stratagem worked.  The Patent Office allowed the '497 NPPA to issue as Patent No. 8,367,418 ("'418 Patent").  Stating her reasons for allowing the patent to issue, the examiner wrote on November 4, 2012 that it was being allowed due to the inclusion of the Fayad Technology of administering a glucose

capsule whose coating dissolves in the pH environment of the ileum (copy annexed

as Exhibit 6; emphasis supplied):

> The following is an examiner's statement of reasons for allowance:  Applicant serial no. 12/911,497 is being allowed since none of the prior art of record teaches or fairly suggests a method for lowering the cardiovascular risk in a Type 2 diabetes patient who is being treated with an anti-diabetes drug by first obtaining the cardiovascular risk scores for the patient at two different time points in accordance with the measurements set forth in independent claim 7, **and then treating the Type 2 diabetes patient by administering a pH-encapsulated glucose to the patient** when it is determined from the cardiovascular risk scores that the patient is at a greater cardiovascular risk at the second time point as compared to the first time point.  The amended claims are now patentable under 35 U.S.C. 101 since the amended claims include additional steps (*i.e.* treatment steps) that are non-conventional and non-routine to practically apply the natural correlation between measured data released to glucose supply parameters and insulin demand parameters in a type 2 diabetes patient and a suitable drug combination for treating the patient.  **The amended claims now cover only one specific practical application of the correlation (*i.e.* the specific non-conventional and non-routine treatment of a type 2 diabetes patient with a pH-encapsulated glucose to lower cardiovascular risk of the patient), not all practical applications of the correlation.**

153.    The transactions concerning the '418 Patent were concealed from

Fayad, and Fayad was excluded from being named on it, though the '418 Patent

was allowed based on Fayad's research and the Fayad Technology belonging to the

Joint Venture.

**D.**          **TheraBrake is formed ostensibly to further the Joint Venture.**

154.    On April 4, 2011, Schentag incorporated TheraBrake, Inc.

("TheraBrake") in Delaware to hold the intellectual property of the Joint Venture.

In his complaint in this action, Schentag alleges that TheraBrake was owned 50/50

by Schentag and Fayad from the time of TheraBrake's formation to November 1,

2014. Complaint, ¶ 6.  However, from the start, Schentag angled to take advantage

of Fayad as a practicing physician without legal experience or commercial

sophistication, and lacking funds to obtain his own representation or pursue other

options.

155.    For example, by email dated June 13, 2011, Schentag had his

Buffalo, New York lawyers write Fayad stating that it was not recommended for

Fayad to hold a 50% interest in TheraBrake, since this would make it impossible to

resolve disputes over the direction of the company:

> Joseph,
>
> Thank you for returning the corporate questionnaire for
> TheraBrake.  I have several questions to the responses
> you provided in the questionnaire (numbers below
> correspond to questionnaire numbering): …
>
> 2 (directors) - - I recommend against having only two
> directors.  In the event that there is a disagreement that
> cannot be worked out, the corporation may be unable to
> take action on that issue.  Essentially, each director is
> given a veto that cannot be overridden. …

5.F. (shareholders) - I recommend against equal ownership where there are only two owners.  In the event that there is a disagreement that cannot be worked out, there is no easy solution.  Often, the result is that the corporation needs to be dissolved and assets/liabilities distributed between the two owners.  This is particularly true where both owners are also directors.  See #2 above. While Dr. Schentag's address was provided, we do not have your address.

156.    By follow-up e-mail dated July 10, 2011, Schentag jumped on this advice by stating to Fayad that he would take a 51% interest in the company to Fayad's 49%:

Hi Joe

After our call yesterday, I decided to get back to TheraBrake formation.

The next steps in TheraBrake all depend on us finishing the attached the questionnaire sent by the attorneys forming the corporation.  Once we complete this, it's their roadmap to stock distribution and all the corporate resolutions we need to operate.  Those documents would be signed by us.

First of all, I have now provided my SS#, and you need to do this as well.

I have listed you as 49% owner and me as 51%.  You cannot be 50-50.

As far as titles and authority, we cannot share power equally, because you cannot resolve a dispute.  So I am proposing a power sharing that reflects how we are likely going to handle our business.  I am going to be managing the day to day affairs of TheraBrake, so that makes me President and secretary treasurer.  Just so you don't think that is too much power, I am naming you chairman of the

board.  With that title, you can fire me any time you want and hire a new president.  Hence, you have the corporate power, I have to do the day to day work under your direction and because I am doing the work I get 51% and you get 49%.

That's as clean as you can make one of these IP holding companies.

Obviously, all of our IP going forward is assigned to TheraBrake, and right now I am still on the fence about the USPTO filing we did in March.  For the time being we might just leave that in your name and un-assigned until we get this worked out to move forward without the Snyders hanging on.  Right now I am still concerned about that.

Clearly the new IP I wrote and the new formulations we are to discuss would be handled by Henry Coleman and assigned to TheraBrake.  There are no Snyder hangers-on with new IP in both of our names and assignments to TheraBrake.

Read what the Lawyers wrote below again, please.  If there is ANYTHING here you want to handle differently than I have written, now is the time to state that, since the attached corporate questionnaire would then go back to the lawyers and they would issue corporate papers to follow this plan and organize TheraBrake in that manner. You may notice that I have not paid them as yet, the whole think [sic] is going to cost about $4000 by the time its [sic] done.

157.    Upon information and belief, Schentag made these representations to Fayad with the intention of lulling him into believing that Schentag was faithfully living up to his obligations to the Joint Venture and that "the new IP … would be … assigned to TheraBrake."  Despite Schentag represented that all

relevant IP was being assigned to TheraBrake, for example, this was untrue as shown above.  Schentag represented that Fayad could fire Schentag at any time, yet as evidenced by the allegations of his instant complaint, Schentag is now suing Fayad – ostensibly on behalf of TheraBrake – for firing him. Complaint, ¶¶ 58-59.

**E.        Schentag misappropriates the Fayad Technology.**

158.    Following the formation of TheraBrake, Schentag commenced plundering the Fayad Technology, while pretending to be pursuing opportunities on behalf of the Joint Venture.  For example, Schentag formed a company – as per the plan when the Joint Venture was formed of using individual companies to develop individual pharmaceutical products described above – called MetaBrake LLC on July 18, 2012.  MetaBrake was formed to exploit the combination of Fayad Technology and metformin (a Type-2 diabetes medication).  However, MetaBrake was not at all a 50/50 venture owned by Fayad and Schentag.  Rather, MetaBrake was put forward to investors as a joint venture of InVenture Partners and TheraSyn Companies —founded by Schentag, and in which Fayad has never had any interest.

159.    The "Ownership and Management" section of the investor letter for MetaBrake (copy annexed as Exhibit 7) made the astonishing representation that *TheraSyn*, not TheraBrake, was the owner of the Fayad Technology:

As a Joint Venture, the Company is wholly owned by InVenture, the founding members and TheraSyn. TheraSyn is the sole owner of the Brake™ Patent, and the University at Buffalo has rights to the technology from its agreements with TheraSyn.  Following the proposed sale of 30% of the Units to investors, TheraSyn will retain 40% of the Units of MetaBrake LLC, and InVenture Partners, Drs. Schentag and Fayad will each maintain a 10% ownership interest in MetaBrake LLC.

The Company will be managed by Dr. Schentag as Chairman and Managing Partner.  The company operations will be handled by InVenture, with Felix Botelho designated as CEO and Paul Barone as CFO. Drs. Schentag and Fayad will serve the company as chief scientific and medical officers.  Dr. Schentag is serving as the Company's Chairman and Managing partner and will continue to lead scientific development efforts.

160.    Any doubt that the reference in the foregoing to the "Brake™ Patent" – owned "solely" by TheraSyn – referred to the Fayad Technology owned by the Joint Venture, was put to rest in the MetaBrake "Executive Summary" of August 8, 2012 (copy annexed as Exhibit 8), describing the applicable technology and intellectual property (emphasis supplied):

### Intellectual Property

Marketing exclusivity is driven by 3 key patent strategies: formulation, method of use and data.  **Method of Use patent(s) will focus on Brake™ as the only non-surgical expression of the pathway that mimics RYGB surgery and thereby decreases the appetite for refined sugars, thus decreasing weight, hyperglycemia and triglycerides.**  Additional Method of Use patents claiming MetaBrake™ combination effect will be filed on the basis of final formulation and clinical outcomes in

the trials.  There are two formulation patents, the first
being a novel formulation of Brake™.  The second
formulation is MetaBrake™ combination, this patent will
be filed after clinical optimization studies are carried out.
All formulation patents will also have a process patents
for the novel manufacturing of Brake™ in our GMP
facility in Western NY.  Data patents are also numerous
and will be driven by the final Clinical Development
Plan.

161.    The meaning of the above reference to "the only non-surgical
expression of the pathway that mimics RYGB surgery and thereby decreases the
appetite for refined sugars, thus decreasing weight, hyperglycemia and
triglycerides" is to gastric bypass surgery (Roux-en-Y gastric bypass) that is
mimicked by the Fayad Technology, allowing a nutritional substance, such as
glucose, to bypass most of the digestive tract and reach the ileum.  In other words,
MetaBrake was touted as primarily relying on the Fayad Technology, yet not only
was the Joint Venture excluded from MetaBrake, but its Fayad Technology was
put forward as owned by TheraSyn!

162.    Schentag's purpose in making misrepresentations such as the
foregoing was not to steal legal title to patents or patent applications filed over the
years on behalf of Fayad, or combinations of Fayad and Schentag, with or without
other inventors.  Rather, Schentag used such misrepresentations to further his own
interests, separate from the interests of the Joint Venture, without needing to steal
legal title to the Joint Venture's intellectual property.

163.   For example, Schentag obtained $2,000,000 in grant money from the State of New York Regional Economic Development Council in December 2012 for an entity known as TheraSyn Pharmaceuticals, Inc., founded by Schentag on August 16, 2002, and in which Fayad and the Joint Venture have never had an interest.  Schentag obtained the grant based on the same misrepresentation he had made in the Metabrake transaction, claiming that ThereSyn owned the Fayad Technology and was putting it to productive use.  Schentag used the "project name" of "Brake" to obtain the $2 million grant, and to strengthen the notion that TheraSyn owned the Fayad Technology.  For the same reason he described the grant expenditures as "UB CAT: Clinical Trial Protocol Development and Material Testing for Brake, TM an Oral Mimetic of RYGB Surgery."

164.   Plainly, the $2 million grant was obtained for TheraSyn Pharmaceuticals, Inc. based on the misrepresentation that TheraSyn owned the Fayad Technology and was putting it to productive use.  In this way, Schentag was able to enrich himself while appearing to conform to the premises of the Joint Venture, for example, even executing a TheraBrake shareholders agreement in July 2013 that "generously" acknowledged "Chairman of the Board" status to Fayad and blocked Schentag from taking certain unilateral actions on behalf of the company.

165.    A further example of Schentag's plundering the Fayad Technology to enrich himself is his deal with Assembly Biosciences, Inc. ("Assembly Biosciences").  Upon information and belief, on November 8, 2013, a "License and Collaboration Agreement" was entered into among Ventrus Biosciences, Inc., a company later merged into Assembly Biosciences, and TheraBiome, LLC ("TheraBiome"), a copy of which is annexed as Exhibit 9.  Fayad has no stake in TheraBiome, directly or through any of the companies of the Joint Venture.  The subject of the license agreement was stated to be "Intellectual Property [assigned to TheraBiome by] Dash and TheraSyn relating to the oral delivery of pharmaceutical drugs (including, but not limited, to, microbiota, vaccines and small molecules) to specific sites in the intestine, using controlled release platform technology."  The signatories on the TheraBiome side of the Assembly Biosciences deal were Schentag, as TheraBiome's "Partner/Member/Chairman" and Mohan Kabadi ("Kabadi"), as TheraBiome's "Partner/Member/President."  Upon information and belief, among other things, the agreement provided for the licensor, TheraBiome, to receive an upfront payment of $300,000 upon execution of the agreement, and at least one additional payment of $100,000.

166.    In turn, Assembly Biosciences licensed the foregoing technology in 2016 to Allergan plc ("Allergan"), with an upfront payment of $50 million and

additional financial benefits in further development.  According to the agreement

between Assembly Biosciences and Allergan (copy annexed as Exhibit 10):

> Allergan will make an upfront payment to Assembly of
> $50 million for the exclusive, worldwide rights to
> develop and commercialize the UC, CD and IBS
> compounds.  Additionally, Assembly will be entitled to
> receive success-based development and commercial
> milestone payments.  Assembly is also eligible to receive
> tiered royalties based on net sales.  Allergan and
> Assembly will generally share development costs
> through proof-of-concept (POC) studies, and Allergan
> will assume all post-POC development costs.

167.   The "Licensor IP" of TheraBiome licensed to Ventrus (later

Assembly Biosciences) and, in turn, to Allergan was defined as "all Intellectual

Property Controlled by Licensor or its Affiliates as of the Effective Date or

thereafter during the Term that relates to and/or may be useful for the Licensor

Technology and/or Products and Therapies (including, without limitation, Licensor

Technology and any Licensor Improvements)."  Thus, "Licensor IP" consisted of

anything "relating to" or "useful for" the "Licensor Technology" — a term that

definitionally referred back to the recitals of the Ventrus/TheraBiome agreement

and was defined, as shown above, to be TheraBiome's technology, derived from

"TheraSyn," "relating to the oral delivery of pharmaceutical drugs (including, but

not limited to, microbiota, vaccines and small molecules) to specific sites in the

intestine, using controlled release platform technology."

168.     Upon information and belief, the foregoing constituted a giveaway by Schentag, acting for TheraBiome, of virtually all the Fayad Technology.  For example, aside from "microbiota" drugs — Allergan's announced current focus under the license — the oral delivery of small-molecule drugs to specific sites in the intestine would include everything the Joint Venture was supposed to be developing.  "Small molecule" drugs include all drugs that are not peptides or proteins, and would include, for example, the glucose/metformin combination for release at the ileal region of the intestine that was supposed to be the basis of MetaBrake's business.  Taken at face value, Schentag now gave this technology away in a deal benefiting TheraBiome, in which neither Fayad nor the Joint Venture have any stake (while simultaneously failing to capitalize MetaBrake, for example, or have it produce any product generating revenue for the Joint Venture).

**F.          The '830 NPPA and the '283 NPPA**

169.     The announced focus of Allergan under the TheraBiome/Assembly Biosciences license consists of two non-provisional patent applications: No. 14/771,830 entitled "Targeted Gastrointestinal Tract Delivery of Probiotic Organisms and/or Therapeutic Agents" ("'830 NPPA") and No. 14/387,979 entitled "Gastrointestinal Site-Specific Oral Vaccination Formulations Active on the Ileum and Appendix" ("'979 NPPA") — the first of these being the primary focus.  The only listed inventors of both patent applications are Schentag and

Kabadi.  Copies of the relevant portions of those NPPAs are annexed as Exhibit 11

and 12, respectively.  According to the abstract of the '830 NPPA:

> The present invention relates to the development of a
> targeted delivery system for the oral delivery of
> probiotics or therapeutic agent for various indications,
> including and not limited to active and prophylaxis
> treatment of *Clostridium difficile* infection, antibiotic
> associated diarrhea, irritable bowel syndrome, Crohn's
> disease, intestinal flora replacement, supplemental flora
> treatments for patients taking antibiotics, and for
> restoration of balance and signaling between the
> intestinal microbiome and the intestinal cells in patients
> under treatment of metabolic syndrome manifestations,
> specifically diabetes, insulin resistance, obesity,
> hyperlipidemia and hypertension.

170.    After restriction, a non-final Patent Office action issued on

February 14, 2017, rejecting the '830 NPPA's claims over six prior art references.

Following a response by the applicants, the '830 NPPA was allowed on

October 17, 2017 (annexed as Exhibit 13) for a "capsule-in-a-capsule structure"

"where a first capsule comprises a probiotic formulation targeted to the proximal

colon and reverse enteric coating which solubilizes in a pH of about 6.2 to about

6.5, and a second capsule comprises the first capsule and a probiotic formulation

targeted to the ileum and an enteric coating that solubilizes in a pH of about 7 to

8."  On November 11, 2017, a Request for Continued Examination was filed with

an information disclosure statement showing an additional prior art reference.

171.    Although Fayad was not named as an inventor with respect to the

'830 NPPA, and the Joint Venture was given no interest in the '830 NPPA nor the

$50 million Assembly Biosciences deal that premised on it, the '830 NPPA itself

flows directly from the Fayad Technology.  Fayad is improperly omitted as an

inventor on the '830 NPPA, and the '830 NPPA rightly belongs to the Joint

Venture.[2]  The *only* allowed claims of the '830 NPPA are for a capsule containing

a capsule, where the outer capsule contains probiotic material for delivery to the

ileum, and configured to dissolve in the 7 to 8 pH range prevailing in the ileal

region, and the inner capsule contains probiotic material for delivery to the

proximal colon, and configured to dissolve in the 6.2 to 6.5 pH range prevailing in

the region of the proximal colon.  Both the delivery of probiotic material to these

two regions, and the use of bi-phasic enteric coatings to do so, were explored by

Fayad and imparted to Schentag in the course of the Joint Venture with the

intention that inventions flowing from them would belong to the Joint Venture.

172.    Fayad and Schentag are the named inventors on a pending patent

application, No. 14/759,283 filed on January 8, 2014 entitled "Activation of the

Endogenous Ileal Brake Hormone Pathway for Organ Regeneration and Related

Compositions, Methods of Treatment, Diagnostics, and Regulatory Systems" (the

---

[2] All allegations pertaining to the '830 NPPA apply equally to the '979 NPPA.

"'283 NPPA", a copy of the relevant sections of which are annexed as Exhibit 14).

The '283 NPPA has a priority date of January 8, 2013 (based on a prior provisional

filing).  The following is a sampling of the '283 NPPA's specification showing

direct anticipation of the technology that was supposedly new in TheraBiome's

'830 NPPA licensed to Assembly Biosciences and Allergan (noting that "proximal

colon" and "ascending colon" are interchangeable terms for the same area of the

lower intestine):

> [0139] In other alternative embodiments the present
> invention is directed to a pharmaceutical composition in
> unit dosage form comprising a first composition and a
> second composition, said first composition comprising a
> daily dose of between about 5 grams to about 20 grams
> of an ileal brake hormone releasing agent which is
> encapsulated within an enteric coating which dissolves in
> vivo at a pH of around 7.2 to around 7.5 and releases said
> substance within said subject's ileum and ascending
> colon causing release of at least one ileal brake hormone
> from L-cells of said subject, said second active
> composition being formulated in immediate and/or early
> release form in an over-coating onto said enteric coating,
> wherein said second composition works in concert with
> said first composition to treat a subject's metabolic
> syndrome manifestations.

> [0170] In another embodiment, the invention is directed
> to a medicament for use in the regeneration of organs and
> tissues in a subject suffering from one or more organ or
> tissue manifestations of glucose supply side associated
> metabolic syndrome, said medicament comprising a
> pharmaceutical dosage form comprising an inner
> controlled release component comprising an ileal brake
> hormone releasing substance comprising about 10 grams
> to about 20 grams of a refined sugar which is

encapsulated within an enteric coating which releases at least about 50% by weight of said ileal brake hormone releasing substance in the ileum and ascending colon of said subject, and an optional outer release component over-coating said inner controlled release component, said outer release component over-coating comprising an immediate or early release layer of a second active medicament, said second active medicament acting synergistically with the inner core ileal brake hormone releasing substance upon one or more manifestations of said patient's metabolic syndrome.

[0435] Use of the disclosed treatments and methods of modifying human gastrointestinal flora for purposes of triggering regeneration of pancreatic beta cells, hepatic cells and regeneration of GI tract cells to benefit metabolic syndrome treatment are based on the findings incorporated by reference herein. The probiotic organisms chosen for over-coating in the formulation of the second active ingredient are *Faecalibacterium prausnitzii, Bacteroides thetaiotaomicron*, and *Lactobacillus johnsonii*. The approximate dose of these strains for release in the ileum according to the formulation is $10^6$ to $10^8$ colony forming units. It is anticipated that these specific organisms would be co-formulated with typical probiotic organisms such as lactobacilli and bifidobacteria.

[0524] One potential combination product with Brake, where the end result is restoration of the integrity of the small bowel, would be use of Brake with a small amount of a locally acting corticosteroid such as budesonide in a daily amount of 3.0 mg, where the goal of the steroid in the combination product is to lower the luminal inflammation in diseases like Crohn's and Ulcerative colitis. As these products are targeted for release also in the ileum or ascending colon, the practical aspect of co-formulation would be to combine the corticosteroid within the ileal brake hormone releasing substance core. In this case, all components of the formulation need to be

released at the same site in the intestine, so the coating used for release of the ileal brake hormone releasing substance is sufficient for the entire components, that is to incorporate the second active drug as well.  There are other short acting local steroids available as alternatives to budesonide, for example mometasone, ciclesonide, beclomethasone, fluticasone, flunisolide and other similar compounds that are topically active and metabolized locally, generally lacking systemic steroid activity and side effects.  Said steroids are typically used by inhalation to treat conditions such as asthma, which also takes full advantage of their local action.

[0525] In another preferred embodiment of a Brake combination treatment for inflammatory bowel diseases, the combination may optionally include a probiotic bacterial organism or composition of probiotic organisms, in this case also formulated for release in the ileum or ascending colon, in a dosage of $10^6$ to about $10^8$ colony forming units.  The purpose of this additional preferred active ingredient is to repair the intestinal dysbiosis which often accompanies the various forms of inflammatory bowel disease.

173.  The provisional patent application on which the '283 NPPA was based was filed in January 2013, before the Schentag/Kabadi provisional application on which the '830 NPPA was based was filed (March 14, 2013). Thus, the '283 NPPA was filed just before the '830 NPPA, showing that Fayad was collaborating with Schentag, pursuant to the Joint Venture, on an invention that encompassed the same invention that Schentag was secretly planning to take for himself by filing a provisional patent application with Kabadi, and then the '830 NPPA, from which Fayad and the Joint Venture were excluded.  The

'283 NPPA refers not only to the delivery of probiotic payloads to both the ileum and the proximal colon, but also to the use of bi-phasic enteric coatings to do so. Further, the '283 NPPA directly refers to the treatment of Crohn's disease and inflammatory bowel disease, which were a significant focus of the '830 NPPA and the announced focus of Allergan's January 9, 2017 press release on the TheraBiome/Assembly Biosciences deal:

> "Inflammatory diseases of the GI tract, including Crohn's disease and ulcerative colitis, are debilitating conditions that remain poorly treated for many patients," said Martin J. Blaser, MD, Director of the New York University Human Microbiome Program.  "Therapies leveraging the microbiome may be able to address these disorders in fundamentally new ways.  I am encouraged that microbiome innovators such as Assembly and Allergan are working to convert their promising new approaches into clinically useful products to help these patients."

174.  To put to rest any doubt that Schentag engaged in wholesale copying of the Fayad Technology, the following are side-by-side comparisons of charts used in the January 8, 2013 provisional patent application on which the '283 NPPA was based, and the March 14, 2013 provisional patent application on which the '830 NPPA was based:

| January 8, 2013 – Fayad/Schentag filing of the organ regeneration US Provisional No. 61/750,042 (upon which US Patent Application No. 14/759,283 is based) | March 14, 2013 – Kabadi/Schentag filing of US Provisional Application 61781810 (formed the earliest priority date for US Patent No. 14/771,830) |
| --- | --- |





175.  These charts, which show graphically and beyond any doubt that Schentag copied the Fayad Technology wholesale to obtain the

TheraBiome/Assembly Biosciences deal, are merely a selection of the material that Schentag copied for the purpose and with the effect of depriving the Joint Venture of the benefits of the Fayad Technology and any related inventions based on or derived from it.  Manifestly, whole portions of the '830 NPPA forming the basis of the TheraBiome/Assembly Biosciences/Allergan deal were copied, without Fayad's knowledge, from the '283 NPPA.

176.  Fayad should have been a named inventor on the '830 NPPA, and the TheraBiome/Assembly Biosciences/Allergan deal properly belongs to the Joint Venture.

G.          **The '830 NPPA arose from the Fayad Technology.**

177.  In addition to the '283 NPPA, there is abundant evidence of the technology covered in the '830 NPPA arising out of the Fayad Technology predating it.  For example, regarding the delivery of probiotic material to portions of the intestinal tract, it can be seen as early as the filing of provisional patent application, No. 61/551,638 ("'638 PPA"), on October 26, 2011 by Fayad and Schentag (relevant sections annexed as Exhibit 15) pursuant to the Joint Venture that this technology was fully regarded as part of the Joint Venture.  For example, page 19 of the '638 PPA provides: "Combinations that will act beneficially on gastrointestinal flora include pH encapsulated pro-biotic organisms that release

the live bacteria in the ileum at pH 7.0 to 7.4, these pH encapsulated probiotic bacteria may be combined further with treatments for irritable bowel disease such as linaclotide or even with antibiotics where the goal is to restore bacterial flora after disruption by potent antibiotic therapy."

178.  The '638 PPA also contemplated the release of probiotic material through a capsule configured to dissolve at the 6.5 pH environment of the proximal colon, as shown in several places, including page 54: "A composition … according to the invention … may also include the use of an intestinal pro-biotic mixture of bacteria formulated to release at pH between about 6.5 and about 7.5, which replaces the bacterial flora of the intestine …."  In addition to calling out the use of probiotic material to treat irritable bowel disease on page 19, the '638 PPA further discussed Crohn's disease (*see*, page 25).

179. As for the bi-phasic enteric coatings to which the '830 NPPA was eventually limited, they were also explored by Fayad prior to his meeting Schentag, and were fully within the scope of the Joint Venture.  For example, in September 2008, Fayad was extensively testing capsules for the delivery of materials to the lower intestine using subcoatings and overcoatings.  Upon information and belief, in any event, capsule-within-a-capsule technology was itself not a novel technology at the time claimed in the '830 NPPA, but was novel only in connection with the other claimed aspects of the '830 NPPA, namely, for

the delivery of probiotic material as provided generally in the Fayad Technology. Upon information and belief, Schentag licensed the capsule-within-a-capsule technology as provided in the Assembly Biosciences deal solely to avoid using the Joint Venture to do the deal based on the pretense that that technology was separate from the Joint Venture's technology.  As shown, the pretense is false.

**H.          Schentag misuses trademarks to cheat the Joint Venture.**

180.  Schentag also used the trademark registration system to take opportunities belonging to the Joint Venture for himself without appearing to alter or manipulate Joint Venture properties.  For example, on February 23, 2011, Schentag filed trademark application, Serial No. 85/249,788, to register the mark BRAKE for "antibacterial pharmaceuticals; anti-infective pharmaceuticals; anticancer pharmaceuticals; and antiviral pharmaceuticals; pharmaceuticals for use in connection with the treatment of diabetes, sepsis, and gastrointestinal diseases" in Class 5; and "research and development services and consulting related thereto in the fields of antibacterial pharmaceuticals; anti-infective pharmaceuticals; anticancer pharmaceuticals; and antiviral pharmaceuticals; pharmaceuticals for use in connection with the treatment of diabetes, sepsis, and gastrointestinal diseases" in Class 42.  On the same date, Schentag filed a trademark application, Serial No. 85/249,793, to register the mark WAKE UP THE BRAKE for the same goods and services in the same trademark classes.

181.  Both of the foregoing trademark applications were filed on behalf of TheraSyn Pharmaceuticals, Inc., namely, the corporation created by Schentag in 2002 in which neither Fayad nor the Joint Venture had any interest.  Both trademark applications are shown in USPTO records as becoming abandoned in 2015, yet Schentag repeatedly used the marks with ™ symbols in submissions to obtain the $2 million grant from New York State and the $50 million Assembly Biosciences deal, further suggesting to the counterparties to those deals that Schentag's separate entities owned and controlled the applicable technologies.

**I.**        **Georg Nebgen and Parviz Ghahramani join the Joint Venture.**

182.  On or about November 1, 2014, Schentag introduced Georg Nebgen to Fayad.  At Schentag's urging Nebgen became the third member of the Joint Venture.  The purpose of adding Nebgen was to form a development team, restructure and reposition development efforts, and make presentations to raise capital on behalf of the Joint Venture.  Specifically, for Nebgen's anticipated contribution, Schentag and Fayad accepted him as an equal member of the Joint venture, and reallocated their interests in TheraBrake to split them evenly with Nebgen, resulting in Schentag, Nebgen and Fayad each having a one-third ownership of both the Joint Venture and TheraBrake.

183.  The next step towards fulfillment of the Joint Venture was the addition of Parviz Ghahramani as a 7.9% member, and the incorporation, in Switzerland, of Volant Holdings by Nebgen to receive and hold TheraBrake's intellectual property consisting of the Fayad Technology and follow-on developments.  Upon information and belief, Nebgen accomplished this on October 15, 2015, allocating ownership in Volant Holdings as follows: Schentag 30.7%; Nebgen 30.7%; Fayad 30.7% and Parviz 7.9%.  The parties to the Joint Venture also formed Volant Pharma with the intention that it was to be the core operating company of the Joint Venture.

184.  Parviz paid for his stock in Volant Holdings.  His role was to advance the Joint Venture's interests based on extensive contacts and know-how as a well-known scientist in the pharmaceutical industry worldwide. Specifically, Parviz was assigned the role of Chief Operating Officer of Volant Pharma under a contract to pay an annual salary of $348,000 for 75% of his time. Parviz accepted his role based on concrete representations on behalf of TheraBrake that (1) Volant Holdings would possess 100% of the Fayad Technology; (2) all related patents and patent applications were assigned to Volant Holdings at the end of October 2015, and (3) Volant was investment ready.  In fact, as shown, Schentag withheld intellectual property assets and opportunities properly belonging to the Joint Venture; and Parviz was not paid

any salary despite rendering the services for it.  Contrary to the agreements

pursuant to which Parviz became a member of the Joint Venture, Schentag now

seeks to force Volant Holdings to convey its intellectual property assets to

TheraBrake (the company in which Parviz has no interest), but leaving Volant

Holdings (a company in which Parviz is a member) responsible for the liabilities

associated with those assets in Volant Holdings.

**J.      The Asset Purchase Agreement between Volant and TheraBrake.**

185.  Effective October 15, 2015, Volant Holdings entered into an asset

purchase agreement (copy annexed as Exhibit 16) with TheraBrake to formally

acquire the intellectual property listed in Schedule 1.1 of the agreement,

consisting of all of TheraBrake's intellectual property assets (but not including

the intellectual property Schentag improperly withheld from TheraBrake).  The

consideration paid by Volant Holdings to acquire these assets was a promissory

note from Volant Holdings to TheraBrake in the face amount of $566,510, and an

assumption of liabilities (the "Volant Promissory Note").  According to the asset

purchase agreement, TheraBrake's predominant liability was not assumed by

Volant Holdings, namely, a promissory note from TheraBrake to TheraSyn

Sensors, Inc. ("TheraSyn Sensors") dated September 10, 2015, under which

TheraBrake was liable to TheraSyn Sensors for the face amount of $517,499.24

(the "TheraSyn Sensors Note").  Though mentioned in the asset purchase

agreement, Schentag — who is the sole signatory on the TheraSyn Sensors Note — did not include it as an exhibit to any part of the asset purchase agreement, and did not bring it to the attention of the other parties to the asset purchase agreement.

186.  Neither the shareholders nor the directors of TheraBrake approved the issuance of the TheraSyn Sensors Note.  The approval of the shareholders and directors of TheraBrake was required before ThereBrake could validly sign and become subject to the obligations purportedly created by the TheraSyn Sensors Note.

**K.**         **The TheraSyn Sensors Note is a sham.**

187.  Upon information and belief, TheraSyn Sensors is a corporation owned and controlled by Schentag in which Fayad, Nebgen and Parviz own no interest.  According to the TheraSyn Sensors Note, the $517,499.24 face value is owed by TheraBrake for "value received."  The TheraSyn Sensors note provides no information to determine the composition of this value.  Upon information and belief, no material amount of money was ever given to TheraBrake by TheraSyn Sensors.  Moreover, to the extent Schentag purports to have contributed money or services to TheraBrake through TheraSyn Sensors or otherwise, this was

Schentag's responsibility to the Joint Venture and the basis upon which he was given an interest in it.

188.  Upon information and belief, the only other assets that could possibly be included as "value received" under the TheraSyn Sensors Note would be the following three patents shown in Patent Office records as having been assigned from TheraSyn Sensors to TheraBrake:

| PATENT NUMBER | INVENTOR | TITLE | THERASYN SENSORS TO THERABRAKE RECORDATION |
|---|---|---|---|
| 9,443,060 | Schentag, Fayad, Monte | METHOD AND SYSTEM TO PROVIDE PERSONALIZED PHARMACEUTICAL COMPOSITIONS AND DOSAGES | 9/23/2015 |
| 8,999,721 | Schentag, Monte, Fayad | METHOD AND SYSTEM TO PROVIDE PERSONALIZED PHARMACEUTICAL COMPOSITIONS AND DOSAGES | 2/4/2015 |
| 8,367,418 | Monte, Bright, Schentag | METHOD AND SYSTEM TO PROVIDE PERSONALIZED PHARMACEUTICAL COMPOSITIONS AND DOSAGES | 9/23/2015 |

189.  However, Patent No. 9,443,060 was applied for by TheraBrake. Consequently, for this reason among others, the recordation of this patent as being assigned from TheraSyn Sensors to TheraBrake appears to be fraudulent. Patent No. 8,999,721 lists Fayad as one of the inventors, and although applied for by TheraSyn Sensors, should have been applied for by TheraBrake given its subject matter as within the Fayad Technology of the Joint Venture.  Upon information and belief, to the extent the patent was inadvertently applied for by TheraSyn Sensors, transfer to TheraBrake would have been proper without consideration.  The '418 Patent is the patent discussed above that was allowed due solely to the inclusion of the Fayad Technology and, upon information and belief, belonged to the Joint Venture without the need for TheraBrake to pay any consideration for its transfer to TheraBrake.

190.  For all of the foregoing reasons, TheraSyn Sensors never provided any value to TheraBrake.  Upon information and belief, Schentag was able to obtain the agreement of TheraBrake to the TheraSyn Sensors Note because Schentag is the only signatory on the note, and signed it on behalf of TheraBrake as its CEO.  The notices provision of the TheraSyn Sensors Note provides for notice to be given, if to payee, to TheraSyn Sensors, Inc., 100 Crosby Boulevard, Eggertsville, NY 14226, Attn.: Jerome J. Schentag; if to maker, to TheraBrake,

Inc., 100 Crosby Boulevard, Eggertsville, NY 14226, Attn.: Jerome J. Schentag. The TheraSyn Sensors Note is a sham.

**L.**     **Fayad, Nebgen and Parviz discover Schentag's schemes.**

191.  In March 2017, Fayad, Nebgen and Parviz accidentally discovered that Schentag had filed patent applications, namely, the '830 NPPA and the '979 NPPA with Kabadi, that copied large portions of patent filings belonging to the Joint Venture, but excluded the Joint Venture.  Fayad, Nebgen and Parviz further discovered that the '830 NPPA and '979 NPPA had been licensed to Assembly Biosciences and, in turn, to Allergan, without the knowledge of, and with no benefit to the Joint Venture.  After confronting Schentag with these and other facts of Schentag's breach of his fiduciary duties to the Joint Venture, and unsuccessful attempts to work out the breaches informally, on July 28, 2017, Volant Pharma terminated Schentag from as an officer of Volant Pharma.

192.  Upon information and belief, secretly, and in reaction to his termination as an officer of Volant Pharma, Schentag caused TheraSyn Sensors to file an action against TheraBrake in New York State Supreme Court, New York County, Index No. 656049/2017, to collect on the TheraSyn Sensors Note. The action was commenced by means of a summons dated August 21, 2017 served by Schentag on himself, followed by a motion for summary judgment in

lieu of complaint dated September 26, 2017 (the "Motion on TheraSyn Sensors Note"), with Schentag appearing as both plaintiff and defendant on the motion.

193.  On December 25, 2017, the court hearing the Motion on TheraSyn Sensors Note denied it with the requirement that the defendant's Board of Directors be notified of the action and given the opportunity to defend it on behalf of TheraBrake.  At the hearing of the Motion on TheraSyn Sensors Note on November 28, 2017, among other things, counsel for TheraSyn Sensors argued that the claim was justified due to an unpaid debt created by TheraBrake owed to patent counsel, and that was therefore being pursued by patent counsel against TheraSyn.  Upon information and belief, TheraSyn has not paid patent counsel any amount approximating the $517,499.24 face value of the TheraSyn Sensors Note; patent counsel has asserted a lien against the TheraBrake patent portfolio now assigned to Volant Holdings; and the justification for TheraSyn Sensor's action on the TheraSyn Sensors Note is entirely specious.  When the Joint Venture was formed, moreover, Schentag agreed to be responsible for paying those and other expenses as part of the consideration he tendered for his interest in the Joint Venture.

194.  On October 28, 2017, upon discovering the Motion on TheraSyn Sensors Note, TheraBrake terminated Schentag as its president.  Schentag

subsequently commenced this action against Volant Holdings, Volant Pharma, Fayad, Nebgen and Parviz, among others.

195.  Upon information and belief, Schentag set up the TheraSyn Sensors Note to be the endgame by which he would finally seize legal title to the assets of the Joint Venture for himself, and to the exclusion of Fayad, Nebgen and Parviz.  By its terms, payments were to begin under the TheraSyn Sensors Note on January 15, 2015, which was eight months before the note was created. Thus, TheraBrake defaulted on the note the same day it was signed.  By its terms, TheraSyn Sensors could accelerate the debt upon any non-payment under the note on the due date.  TheraSyn Sensors could also fail to exercise its rights under the note without waiving them.  Thus, TheraSyn Sensors and, in effect, Schentag, could completely control how and when the entire $517,499.24 plus interest and costs of collection could be claimed as due and foreclosed upon.  In turn, since TheraBrake owned the Volant Promissory Note, foreclosure on TheraBrake could enable Schentag to foreclose on the Volant Promissory Note and, ultimately, all of the assets that had been transferred to Volant Holdings, *viz.*, all of the assets of the Joint Venture that Schentag had not already withheld for himself.

196.  Upon information and belief, for so long as Schentag could have it both ways, which is to say to pursue his separate interests in breach of his

fiduciary duties to the Joint Venture while, at the same time, appearing to support the Joint Venture and benefit from any opportunities that flowed from it, he did not foreclose on the TheraSyn Sensors Note and, ultimately, on the Joint Venture assets.  Once Schentag's breaches were discovered, however, he immediately acted to foreclose on the TheraSyn Sensors Note and trigger his endgame.

197.  Since being terminated by Volant Pharma, Schentag has affirmatively acted to spoil the Joint Venture's business opportunities.  For example, Alex Abuin of BioMedTech Consulting expressed concrete interest, in a LinkedIn conversation with Schentag, in pursuing a license of Volant Holding's (then) recently issued Patent No. 9,757,346 for the nutraceutical market in the U.S.  Rather than answering that he had been terminated by Volant Pharma and, consequently, no longer able to speak on Volant Pharma's behalf, Schentag responded that "We are not able to proceed with any discussions, as the ownership of these patents is a matter of dispute, and that is not resolved."  Upon information and belief, this exchange is representative of many actions taken by Schentag to spoil the prospects of the Joint Venture until such time as Schentag is able to seize full legal ownership of the Joint Venture's assets, in order to take these prospects for himself.

198.  Defendants and Counterclaim Plaintiffs have not as yet uncovered the complete scope of Schentag's misconduct in misappropriating the intellectual property and business opportunities rightfully belonging to the Joint Venture.

## Count I

199.  Defendants and Counterclaim Plaintiffs Nebgen, Fayad and Parviz repeat and reallege the foregoing allegations of this Counterclaim with the same force and effect as if set forth fully here.

200.  Jointly with the inventors listed on the face of the '418 Patent, Joseph Fayad was the first person to conceive and reduce to practice the Fayad Technology incorporated in the subject matter claimed in the '418 Patent.

201.  Joseph Fayad is a true co-inventor of the inventions claimed in the '418 Patent.

202.  Pursuant to 35 USC § 256, Dr. Joseph Fayad should rightfully be listed as a co-inventor of the '418 Patent.

203.  For the foregoing reasons, the Court should enter an order directing Schentag to take such actions, including but not limited to an appropriate submission to the Patent Office under 35 U.S.C. § 116, to list Dr. Joseph Fayad as a co-inventor of the '418 Patent.

## Count II

204.  Defendants and Counterclaim Plaintiffs Nebgen, Fayad and Parviz repeat and reallege the foregoing allegations of this Counterclaim with the same force and effect as if set forth fully here.

205.  Schentag formed a Joint Venture with Joseph Fayad in or about 2011 as aforesaid, in which Schentag and Fayad were equal members, sharing equally in any profits or losses.

206.  At the time of formation, Fayad contributed the Fayad Technology to the Joint Venture, and Schentag undertook to perform the services and provide the funding on behalf of the Joint Venture detailed in the factual allegations above.  The purpose of the Joint Venture was to pursue the development of the Fayad Technology, through follow-on inventions and improvements, and commercial ventures, all for the mutual benefit of the two co-venturers.

207.  Subsequently, Georg Nebgen and Parviz Ghahramani were admitted as members of the Joint Venture.

208.  Following the admission of Georg Nebgen and Parviz Ghahramani, the interests of the four co-venturers in the Joint Venture were: Schentag 30.7%; Nebgen 30.7%; Fayad 30.7% and Parviz 7.9%.

209.  Schentag has breached his fiduciary duties and obligations to the Joint Venture by misappropriating its intellectual and other property, as well as its business opportunities, as aforesaid.

210.  Schentag has breached his fiduciary duties and obligations to the Joint Venture by attempting to, and in part succeeding in, preventing the Joint Venture from commercializing its intellectual property, all as part of a scheme to misappropriate the Joint Venture's property and business opportunities.

211.  Joseph Fayad, Georg Nebgen and Parviz Ghahramani have been damaged by Schentag's breaches of his fiduciary duties and obligations as aforesaid, in an amount to be determined at trial but believed to exceed $50 million.

212.  In addition to their damages, Defendants and Counterclaim Plaintiffs are entitled to (i) an accounting from Schentag for his misappropriation of the assets and business opportunities rightfully belonging to the Joint Venture, (ii) an order directing Schentag to disgorge all benefits he has received from his fiduciary breaches; (iii) pre-judgment interest; and (iv) their costs and reasonable attorneys' fees incurred in this action.

## Count III

213.  Defendants and Counterclaim Plaintiffs Nebgen, Fayad and Parviz repeat and reallege the foregoing allegations of this Counterclaim with the same force and effect as if set forth fully here.

214.  The '830 NPPA and '979 NPPA were based, in substantial part, on the Fayad Technology.

215.  The inventors listed on the '830 NPPA and '979 NPPA improperly excluded Joseph Fayad.

216.  Based on the foregoing, the '830 NPPA and '979 NPPA, and any benefits derived from them, properly belong to the Joint Venture.

217.  In breach of his fiduciary duties and obligations to the Joint Venture, Schentag has attempted to misappropriate for himself the Fayad Technology as incorporated in the '830 NPPA and '979 NPPA.

218.  Joseph Fayad, Georg Nebgen and Parviz Ghahramani have been damaged by Schentag's breaches of his fiduciary duties and obligations as aforesaid, in an amount to be determined at trial but believed to exceed $50 million.

219.  Schentag should be ordered and enjoined to assign the licenses to the '830 NPPA and '979 NPPA to the Joint Venture.

220.  By reason of his breaches of fiduciary duty to the Joint Venture as aforesaid, Schentag should be ordered to disgorge to the Joint Venture all benefits he has heretofore received from the '830 NPPA and '979 NPPA.

221.  In addition to their damages, Defendants and Counterclaim Plaintiffs are entitled to (i) an accounting from Schentag for his misappropriation of the assets and business opportunities rightfully belonging to the Joint Venture, (ii) an order directing Schentag to disgorge all benefits he has received from his fiduciary breaches; (iii) pre-judgment interest; and (iv) their costs and reasonable attorneys' fees incurred in this action.

### Count IV

222.  Defendants and Counterclaim Plaintiffs Nebgen, Fayad and Parviz repeat and reallege the foregoing allegations of this Counterclaim with the same force and effect as if set forth fully here.

223.  The TheraSyn Sensors Note is a sham, and was created by Schentag as part of his scheme to misappropriate the property and business opportunities of the Joint Venture.

224.  Defendants and Counterclaim Plaintiffs are entitled to a judgment declaring that the TheraSyn Sensors Note is null and void.

225.  Schentag should be ordered and enjoined to cancel the TheraSyn Sensors Note, and to disgorge to the Joint Venture any benefit he has received with respect to it.

226.      **WHEREFORE,** Defendants and Counterclaim Plaintiffs Nebgen, Fayad and Parviz demand that judgment be entered in their favor and against Jerome Schentag on the Counterclaim as follows:  (a) ordering and directing Jerome Schentag to take such actions, including but not limited to an appropriate submission to the Patent Office under 35 U.S.C. § 116, to list Dr. Joseph Fayad as a co-inventor of the '418 Patent; (b) ordering and directing Jerome Schentag to account to Defendants and Counterclaim Plaintiffs for his breaches of his fiduciary duties and obligations to the Joint Venture, and ordering Jerome Schentag to disgorge to the Joint Venture all benefits he has obtained by reason of his said breaches of fiduciary duties and obligations; (c) ordering and enjoining Jerome Schentag to assign the licenses derived from the '830 NPPA and '979 NPPA to the Joint Venture, and to disgorge to the Joint Venture all benefits he has heretofore received from the '830 NPPA and '979 NPPA; (d) ordering and enjoining Jerome Schentag to cancel the TheraSyn Sensors Note, and to disgorge to the Joint Venture any benefit he has received with

respect to it; (e) awarding Defendants and Counterclaim Plaintiffs pre-judgment

interest at the statutory rate on the value of all benefits Jerome Schentag has

obtained by his breaches of his fiduciary duties and obligations to the Joint

Venture; and (f) granting Defendants and Counterclaim Plaintiffs such other and further relief, including the costs and disbursements of this action, as to the Court seems just and proper.

Dated:    June 18, 2019
          New York, New York

SCHLAM STONE & DOLAN LLP

By:     Richard H. Dolan
        Thomas A. Kissane

26 Broadway
New York NY 10004
Tel.:   (212) 344-5400
Fax:    (212) 344-7677
Email:      rhd@schlamstone.com
            tak@schlamstone.com

        -and-

LAW OFFICES OF PHILIP A. KANTOR, P.C.

        By:  Philip A. Kantor

Suite 120
1781 Village Center Circle
Las Vegas, NV 89134
Tel.:   (702) 255-1300
Fax:    (702) 256-6331
Email:      prsak@aya.yale.edu

Attorneys for Defendants and Counterclaim Plaintiffs